FILED 04 FEB '21 15:30USDC-ORP

# UNITED STATES DISTRICT COURT
# OREGON DISTRICT, PORTLAND

Steven L. Stanley,           | Case No: 3:21-CV-193-MO
            Plaintiff,       |

Vs.                          | Judge:

Community Development        |
Partners, Guardian           | PLAINTIFFS MOTION FOR
Management LLC,              | ISSUANCE OF A PRELIMINARY
            Defendants.      | INJUNCTION

Comes now Plaintiff and hereby moves the
court for grant and issuance of a Preliminary
Injunction in this cause of action pursuant to
F.R.C.P. Rule 65. It is clear that a single judge
can halt a federally supported agency's effort so as
review and reprioritize in this case, defendants
leasing enforcement, rental application vetting
process/procedures and policies, enforcement of
Americans With Disabilies Act "reasonable
accomadations" requirement", state, city ordinance
no smoking requirements for all commercial-
business facility's, and non-compliane in context
with obtaing and receiving continued "tax credit low
income housing" certification required under federal

Fair Housing Act and LIHTC provisions, and the state Covid 19 restrictions, mandates as it applies to all commercial and business building requirements, and for defendants to provide a rational explanation why and for their policy and practices decisions render them exempt from such mandatory compliance(s) of what Plaintiff has outlined in his Complaint (Sec.1983) filed simultaneously herewith.

Plaintiff states there is just cause for grant of his motion for prelimary injunction and that he will show irreparable harm as a real and immediate threat of ongoing and future injury by defendants acts, policy and present practices. Further, Plaintiff will show convincingly their is a strong public interest in issuance and order for preliminary injunction as with credible evidence in support the likelihood of prevailing on his claims at trial.

Plaintiff will demonstrate facts with documentary support to pass muster as to why such extreme measures are required in existing circumstes are needed in the following Memorandum in Support.

## MEMORANDUM

1.      First, it is significant to note that both defendants by definition are 'State Actors' in that they are engaged in industry commerce as their businesses, operations are on a national (intrastate) scale with interstate communications to support their acquisitions and operations. Second, there is an obvious nexus or "joint relationship dependant on cooperation with Federal and State government in aquireing Federal tax-credit low income housing pursuant to Internal Revenue Code compliance, Fair Housing Act (42 U.S.C. Sec. 3601 - 1437f) [Chptr. 8, 45 - Public Health]. In addition defendants have a symbiotic relationship to Federal, State government in obtaining and receiving grants under such programs as LHTC and OHC funding.

A)  Irreparable Harm:

2.      Plaintiff states he Is and Will continue to be irreparably harmed without such injunction on several fronts. First is the secondhand smoke, no smoking issue. No.1 defendants make nor profess to make any effort at enforcement as written into lease agreement. 2.) MP5 studios by fact and law is a "Commercial Facility" by Fair Housing Act and

(2)

Title III of ADA, notwithstanding "reasonable accom-odation" factor. 3) MP5 is a mixed-use Commercial Facility with several businesses office operations, leasing office "workplace" as with Ms. Heather Scheer, Chef owner of Delilah's Catering with a full-service industrial kitchen and employs staff of a number of people hence 'workplace, then there is a company with commercial offices identified as Reliance HR Solutions in Suite 126-127. On a personal note, residents routinely smoke on the entry/exit door porch stoop day And night which is three feet beside Plaintiffs window. Just as defendants make no effort to enforce this policy they themselves are guilty of violations, i.e., defendant Guardians two maintenance employees. Defendants are in absolute violation of Oregons Clear Air Act (OCAA) which a.) prohibits "no smoking in workplace", "no smoking within "10 feet" of all entrances, exits, windows, and air intake vents"; "post signs at each entrance providing no smoking within 10 feet". Defendants must have an exemp-tion from this city and state requirement and if so, provide it to the court to review.

3.        The second element representing 'immediate' and ongoing physical harm for this exposure

is the health variable it makes little sense to Plaintiff and his pulmonary specialist Melissa Dolbec, NP to waste money and time on pulmonary therapy if Plaintiff returns home only to have his asthma, environmental allergies, exacerbated (see Exhibit 5 attached with complaint). Treatment team at Legacy had to provide Plaintiff with a nebulizer for home use to better counter the smoke exposure which he cannot evade and escape its constant presence.

4. The harmful effects of second hand smoke exposure is no secret. Research clearly demonstrates "second hand smoke can travel throughout a building through doorways, halls, and windows, as well as ventilation systems, electrical outlets, gaps around doors, fixtures and pipes". Ref: King, B.R., Travers, M.J.; Cummings, K.M.J. Mahoney, M.C.; Hyland, A.J., "Second hand transfer in multi unit housing". Nicotine and Tobacco Research, Oct. 1, 2010. www.ncbi.nlm.nih.gov/pubmed/20889473; King, B.A., Peck, R.M., Babb, S.D., "National and State cost savings associated with prohibiting smoking in subsidized and public housing in the United States", Preventing Chronic Disease 11 [E171], Oct. 2014. http://www.cdc.gov/pcd/issues/2014/pdf/14.0222.pd.;

(4)

Repace, J. "Smoke Infiltration in Apartments" 2011.
www.repace.com/pdf/REPACE — Recent % 20 Advances_
ISES % 20 2011. pdf ; HUD Report in 2006 ; U.S.
Surgeon General 2010. www.ncbi.nlm.nih.gov/
books/NBK 53017. (See also Exhibit E at pg. 8
Complaint), Defendants are in material non-compliance
with rental agreement and a serious violation
of agreement. Defendants acts, factual practices
in non enforcement, violation of state, city
ordinances lacks any logical, rational basis for
defendants acts, ommissions, failures in this regard
and contra - antithetical to current and toughening
social standards of law, health, safety, security
and basic human decency and ongoing injury to
Plaintiff with future harm totally irrelevent.
It is the obduracy, reckless disregard, wantoness,
and deliberate indifference to Plaintiffs' medical,
personal safety and security concerns/need that
also rise to the level of Eighth Amendment status.

5.      Lastly, the element of threat of violence
and irreparable harm from the only tenant and
occupant of MP5 Rm. 328 who brandished and
chambered a handgun he stated as Mr. Glock in
the late and early morning hrs. after previously
hurling a full unopened can of beer smashing

(5)

into Plaintiff's second story window as he sat 2 ft. away at his desk directly in front of it at 11:06 pm through 1:00 am on December 28-29, and threatening verbally to "shoot Plaintiffs dead", memorialized in police 911 records and incident report (See Complaint, para 8 at pg. 8-9). Plaintiff has first-hand knowledge of this individual's (MP5, Rm. 328) propensity after witnessing his assault on the then Viridian management's maintenance man Dan Carbo and that Plaintiff referenced as a "cabal member" (see Exhibit 2-A, para. 11, at pg. 7, 8) and also the same person who posted signs on Plaintiffs door labeling him as a "rat" and "police informant" as with writing in red spray paint on a bathroom door "Ethans (a tenant) meth club" which was a lie since he was attempting to get the young man evicted and then later in mid September 2019 chased him down the street and beat him with fists causing cuts, bruises to his face. These events certainly should be documented in MP5 managements records as corroboration. This individual has great hate and disdain as he [Plaintiff] testified as to these events against him while also implicating him by physical description in the Oct. 31 - Nov. 1,

(6)

2019 Burglary and grand theft of some $20,000. of equipement of HR Concrete and Bremik Construction who were contracted for the seismic upgrade and renovations of MP5 Studios and the following morning Plaintiff was called by RPA No org. to come verify if Rm. 328 was in fact the MP5 maintenance man attempting to impersonate him so he could retrieve a tool box he left behind the night (Oct. 31, 2019) of the burglary and grand theft. I exposed his fraudulent attempt to gain entry and told him i had delivered it to the Bremik Construction Supervisor to which he threated me with physical assault. It is this gaggle of knowledge about his dangerous and violent nature that i fear being shot and killed by this individual that the fear of being ambushed by Rm. 328 that i have literally had to abandon my domicile and am staying with 89 year old Mother in Gresham and still paying my monthly rent.

6.      In sum, Plaintiff specifically requests the Court to 1.) issue in such injunction that defendants act in compliance with the States Clean Air Act in posting the 10 ft distance signage required at each entrance to MP5 Studios; make all reasonable efforts

(7)

in accordance with Lease Agreement Landlord/tenant law and contractual relationship as with FHA and ADA provisions, "reasonable accomodation" standards; 2.) order defendants to designate and maintain an interior smoke-free wing or area of the building for non-smoker tenants similarly situated and necessary for those suffering medical infirmeries as Plaintiff; 3.) order defendants to provide Plaintiff with the correct name of the sole occupant of MP5 studios Rm. 328 to expedite issuance of a Restraining order which Gateway Center and Volunteers of America victim assistance program is standing by waiting on the name so as to assist in processing a TRO with the local Courts for such person to remain a safe distance of 40-50 yards which is out of the accurate range of a 9mm handgun killing zone, unless of course this individual is an experienced marksman and or this Court has authority to issue such a TRO under case circumstances. As Plaintiff has yet to receive the $30. public records request (see Exhibit #1 attached herewith). Such order request in regard to no smoking issue and compliance with OCAA certainly poses no hardship, financial or otherwise

upon defendants and simply requires them to act in compliance with laws, Federal and state statutory provisions of FHA, ADA, Clean Air Act which is also in the public interest framework as it is always in the publics interest to act in accordance with the laws, ordinances and protect others as with the elderly and disabled. See, e.g., <u>Winter v. National Resources Defense Counsil, Inc.</u>, 555 U.S. 7, 129 S.ct 365, 376 (2008); <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61, 576-79, 112 S.ct. 2130 (1992); <u>Griffeth v. Detrich</u>, 603 F.2d 118, 121 (9th Cir. 1979); <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-496 (1974). Even with regard to Plaintiffs Eighth Amendment claims which parellels into imminent danger or irreperable harm context fits comfortably as the violation[s] is obvious that there need not be a materially similar case for the right to be clearly established. <u>Pace v. Capobianco</u>, 283 F.3d 1275, 1283 (11th Cir. 2002); <u>Hope v. Peizer</u>, 536 U.S. 730, 738 (2002); <u>Siegert v. Gilley</u>, 500 U.S. 226 (1991). As another matter, Plaintiff has yet to see what the police incident report reveals and questions whether the assaillant (Rm.378) denied the incident described, denied even having a firearm and if police report indicates

that if in fact this tenant has/had such weapon did ask to see the weapon and record the serial number to run an ATF background tracing on the weapon to track its purchase, ownership, origin and if and how he (Rm. 328) even lawful owns the firearm which any experienced law enforcement officer would/should do, especially in view of the rash of shootings and murders in this Northeast sector of Portland. If not and considering the case circumstances, this remains a considerable imminent threat to plaintiff if everytime this tenant gets alcohol and drug sotten and his obvious disdain for Plaintiff considering their past interaction history this tenant may indeed ultimately carry out his threat thus prompting Plaintiff from distancing from his abode at MPS with exception of warily, fearfully hastily running in and out to collect his mail periodically. Plaintiff would request that any issued order require a.) defendants provide Plaintiff and the Court with the full name of tenant Rm. 328 for purpose of Plaintiff obtaining a TRO, and or b.) that this Court has authority to issue such person specific TRO or perhaps incorporate such condition into this requested injunction if so granted.

7.    Yet another component compounding irreparable harm element is of the presence of the Covid 19 pandemic. The facts are one, from the outset of the announcement by govt. of its presence in U.S. and Plaintiff's coronavirus infection on April 4, 2020 made no effort to announce, post mitigation practices until until September 2020 and Plaintiff was distributing face masks for tenants in all community areas of the building until defendant Guardian got it and began providing masks in mid November 2020. As to defendants response to OSHA responding to my formal complaint stating "we have put out the CDC guidance, requiring masks to be worn" finally in December was a bit misrepresenting bearing in mind it was only after OSHA responded to Plaintiffs complaint in Oct. 2020 – 10 months into the pandemic. Furthermore, defendants did not "require" masks in the building, didn't and still don't enforce it much less anything else. In fact, defendants launched an all out rental campaign even providing a cash incentive to tenants bring in a flow of outside rental applicants, promoting group events in MP5's creating a further dangerous exposure to all persons representing a deadly

(11)

threat to all in the midst of a raging pandemic now compounded by three more variants that are even more consequential as the original virus has now mutated developing different spike protein to evade (as all viruses do) immune system by changing its form/shape disallowing T-cell immune attachment to the virus cell to penetrate and kill it and it is about to get worse as all three variants have now been detected in Oregon, California and most likely in Washington as well. Moreover, defendants have not asserted any attempt to enforcement of mask " requirement despite their erroneous falsehoods on paper. For example, on Sunday, Jan. 3, 2021 as Plaintiff was exiting the building at aprox. 1:26 pm Plaintiff encountered a disruptive tenant (Rm. 214) and present on-site resident manager who when passing by the tenant remarked "Wheres your mask", this tenant replied "Fuck you". For the Court to fully grasp Plaintiffs' claim narrative and facts being presented, Plaintiff has collected a compilation of postings defendants have put on display ONLY after Plaintiffs OSHA complaint assembled and marked EXHIBIT #2 attached herewith (see also Complaint, Exhibit 8, para 9 at pg. 11). Defendants reckless and irresponsible, inaction, failures and

(12)

nonsensical practices clearly constitute a threat to and irreparable harm to health, safety, security, past, present and future. It is not so much the 'suggested' CDC guidelines (that necessarily matter but the state-wide, selective county Governors mandates and restrictions issued at any given time which carry the force of law with presribed penalties and total compliance thereof such as apply to all commercial, public, business, workplace facilities as what MP5 is and categorized as. Try walking into any store, office building grocery store without a mask and see what happens. At this point in time one cannot even enter a restraunt, fast food chain sit down and enjoy a meal. Rather than act in conformity and compliance in these tumultuos times, defendants opt to prioritize "leasing deadlines", "occupancy rates" over the safety and lives of people. As any mere observation will reveal, posting "No Mask No Entry", "masks required" is quantively different than "Don't forget to wear a mask" and precipitating a relentless flow of non-residents in and out of MP5 presenting threat and irreparable harm and flamboantly endangering lives in their financial pursuits, where is the balance and equity in this?

(13)

Lastly, Plaintiff has persistently, been harassed, intimidated and threatened with violence by the tenants occupying the room directly above him for Plaintiffs barrage of complaints to management and the fact it would appear have a stolen bicycle "chop" shop breaking bicycles down into parts which Plaintiff has eyewitnessed on a regular basis and mid December 2020 had to go out and hold the entry/exit door shut at 3:18am as they were unloading bicycle parts from stolen grocery carts. A number of these culprits occupy Rm. 316 directly above Plaintiff, are associates of occupants of Rm. 215 next to Plaintiffs room. After Plaintiff blocked their entry with carts of looted and stolen goods that they were unlawfully picking a faulty lock on the door, Plaintiff received no response or questioning of his complaints on said matters. Of special note, all 5 or 6 of these specific were brought in with nothing but their backpacks, sleeping bags, tattered filthy clothing escorted by some "ministries chaplan" from some church and or social services agency's one morning on or about the first week of October and placed in the above cited rooms in a matter of a few hours and Plaintiff has

(14)

suffered miserably while in forced quarantine in
December as result of 9 of his treatment team
at his Department of Health HIV clinic suffered
infections of Covid 19 and where Plaintiff had been
in and out of three times throughout the infectious
outbreak. The foregoing occupants of Rooms 316,
215 literally launched an all out war against
Plaintiff by banging (deliberately) and scrapping
bicycles against his door and outer throughout
late night and twilight hours then escalated
their terror campaign by knowingly stomping
and even hammering on Plaintiffs ceiling in
strategically 30-40 minute intervels insuring to
keep Plaintiff awake many sleepless nights until
Plaintiff finally just vacated his residence to
get some degree of sleep (see Exhibit 8 "Progress
Notes" pg. 1 of 7). In fact, the primary culprit
of the two rooms involved was arrested, hand-
cuffed and taken away by police on Saturday,
January 30 at or arnd. 1:00 pm. Plaintiff knows
for what or why. Now the fear of harm returns
as this resident reappeared and is again present
in the building as Plaintiff writes this narrative
at 6:15 pm, weds. February 3, 2021. Defendants
general practice of ignoring Plaintiffs justified

(15)

and detailed complaints of these events is to put the onerous on Plaintiff requiring "corroboration" while all the while the newly installed security camera is installed three feet outside his door and a mere two-three feet above the very entry/ exit door of where the visibly obvious events have repeatedly occurred. The fact of the matter is there always has been "corroboration" of the excessive noise, arguing, slamming (deliberately) of doors and objects banging on the walls in this precise area lodged by the elderly lady (Ms. Glenda) who had just lost her 51 yr old son to Covid 19 in early December 2020 having to endure all this carnage while in greif over loss of her son. The abject cruelty of defendants indifference practices and failure is unimaginable and simply the result of defendants filling occupancy, "leasing deadlines" is not "erroneous" as defendants obfuscating legal counsel states (see Exhibit 3 attached hereto). The presence of the occupants in Rooms 316 and 215 dovetails into Plaintiffs Complaint Equal Protection Claim. Plaintiff specifically requests the Court to enjoin either 1.) issue an order for defendants to identify and name all legal registered occupants of rooms 316 and 215, 2.)

(16)

that in any such order for those defendants to cease
and desist the herein described disruption, excessive
noise, any acts of harassment, intimidations, threats
in any shape or form, and or order defendants to
relocate said occupents from Room 316 and 215
to another area for the health, safety, security
of the Plaintiff.

C.) The Injunction is in The Public Interests

8.      The public interest always lies in upholding
lease agreement provisions and honoring Landlord/
Tenant law and the contractual relationalship,
respecting the Constitutional, Civil rights of all
citizens, abiding by "reasonable accomodation"
of the Elderly and Disabled pursuant to ADA,
FHA statutory provisions, and it is always in
the public interest to defraud the government
for benefit of "tax credits" — LIHTC grant funding
if Plaintiffs allegations are found to be true.
There is clearly a property interest as well in
that the property interest that due process
protects extend beyond tangible property and include
anything to which a Plaintiff has a legitimate
claim of entitlement. Lugan, 504 U.S. at 576-577;
Detrich, 603 F.2d at 121. This would also encompass
Plaintiffs property interest as does all persons

(17)

in housing benefits (rent assistance) and the
peaceful enjoyment of ones property and residency,
in devaluation of ones equity in home ownership
(See EXHIBIT 4 attached hereto). See Ressler
v. Pierce, 692 F.2d 1212, 1215-16 (9th Cir. 1982).
There is a public interest as well in that Oregon
adopted the ORLTA by the legislature from the
Uniform Residential Landlord Tenant Act (URLTA) in
1973 and "imposes an obligation of good faith"
identical to that imposed by the ORLTA which
consist of obligations and duties by the landlord
to do whatever is necessary to put and keep the
premises in a fit and habitable condition (URLTA
Sec. 2.104(a): (1) comply with requirements of
applicable building and housing codes materially
affecting health and safety; (2) make all
repairs and do whatever necessary to put and
keep the premises in a fit, clean and habitable
condition and safe, inter alia. By extension,
surrounding home owners have a public interest.
MP5 under COD ownership and Guardian have
failed on all accounts and has an ongoing
disparate impact of families who have a
equity concern in their property values making
the outcome of case issues being litigated and

(18)

notwithstanding the shame and public interest in the unlawful deeds CDP's ownership of MP5 has created in the public lens (see EXHIBIT 5 attached hereto). Thus there is a strong public interest in the context of health, safety, security and property devaluation.

9.    On a personal level, Plaintiff indeed not only has a vested constitutionally protected property and public interest by virtue of disability needs, membership in a class of individuals whom rent assistance and low-income housing is intended to benefit and of which is derived from federal funding in turn derived from Americans tax dollars. See, e.g., Board of Regents v. Roth, 408 U.S. 564, 576 (1972). Furthermore, allowing defendants to violate all the aforecited tenants and disparate impact throughout the general surrounding area-neighborhood simply based on a mere "good faith" rhetoric and fear of disparate impact liability would only further encourage such abusive public interest (See, e.g., Ricci v. DeStefano, 129 S.Ct. 2658 (June 29, 2009). Hence, Plaintiff has a strong basis in facts and evidence.

10. Plaintiff states the evidence presented herein and in Complaint at this point strongly indicates he is likely to succeed on the merits of his claims at trial by jury and the balance of equities favor the Plaintiff.

11. Plaintiff hereby incorporates by reference the requested Relief in Complaint, para. 17(c) at pg. 19 into and as a condition to any issued Preliminary Injunction if/when issued. Plaintiff has standing to seek relief through such injunctive or as he is the aggrieved party and it is based on a federal question.

12. Plaintiff respectively asks for an expedited timeframe. F.R.C.P., Rule 26(a).

13. Plaintiff further requests any such issued order also prohibit defendants from any effort to evict Plaintiff with or without cause during the pendency of this case disposition. Plaintiff is already paid up in advance at least two months rent on his lease account.

14. Plaintiff requests a hearing on all matters relevant.

## CONCLUSION

1.    Plaintiff is likely to succeed on merits of his claims.

2.    that Plaintiff will likely suffer immediate harm relative to the facts and circumstances presented without it.

3.    The balance of equities, i.e., health, security and safety of Plaintiff support an injunction.

15.    Plaintiff states under penalty of law all facts stated herein are true and correct to the very best of his belief, knowledge and recollection.


Date:                            Respectfully Submitted;

                                  *Steven L. Stanley*

                                  Steven L. Stanley

                                  MPS / The Studios,

                                  850 NE 81st Av., Suite 216

                                  Portland, Or. 97213

                                  503-957-4226

SWORN and SUBSCRIBED to before me this 4th day
of February, 2021.

OFFICIAL STAMP
IAN MICHAEL HOLDT
NOTARY PUBLIC - OREGON
COMMISSION NO. 1003210
MY COMMISSION EXPIRES AUGUST 18, 2024

                        NOTARY PUBLIC
                        Ian Michael Holdt

(21)

## CERTIFICATE OF SERVICE

I, Steven L. Stanley hereby certify a true and correct copy of the foregoing Motion for Preliminary Injunction was hand delivered to U.S. District Court, Mark O. Hatfield Courthouse, 1000 S.W. Third Ave, Portland, Oregon this 4th day of February, 2021.

Steven L. Stanley

Steven L. Stanley, Plaintiff pro se
850 NE 81st Ave., Suite 216
Portland, Or. 97213

(21)

## CITY OF PORTLAND, OREGON

**Bureau of Police**
1111 S.W. 2nd Avenue • Portland, OR 97204

Integrity • Compassion • Accountability • Respect • Excellence • Service

*Exhibit 1*

Today's Date: 1/22/2021

Steven Stanley
MP5 The Studios
850 NE 81st Ave Suite 216
Portland, OR 97213

*incident # i was given*
*PP20382293*

Dear Steven,

RE: City Public Records Request Reference # **S164034-012221**

This is your confirmation that the Portland Police Bureau has received a Public Records Request from you dated 1/22/2021.

Please be advised that your public records request may take up to 4 to six weeks to be processed.

The City will review your request to determine if it has responsive records. The City will provide copies of requested public records for which the City does not claim an exemption from disclosure, as soon as practicable. If you are not a victim of a crime, the City is permitted to charge its actual costs to provide records. Fees include research time to locate and analyze the requested records, even if no records are located or if the requested records are determined to be exempt from disclosure.

If you have any questions concerning your request please contact the Public Records Unit at 503-823-0756.

Sincerely,

Portland Police Bureau
Public Records Unit



**MONEY ORDER RECEIPT - NON NEGOTIABLE**

PPB *"incident report"*
For obtaining records of that incident

mailed
1/19/21
1:32 PM

AGT 735184 LOC 000132 DT 011921 $30.00 30DOLLARS AND NO CENTS

Payable to: _____

**RETAIN THIS MONEY ORDER RECEIPT, IT MUST BE INCLUDED WITH ALL REFUND REQUESTS. BE SURE TO READ IMPORTANT INFORMATION BELOW AND ON BACK.** For your own records, it is recommended that you make a photocopy of the completed Money Order before providing it to the receiver.

**PURCHASE AGREEMENT:** You the purchaser agree that Western Union Financial Services Inc, (WUFSI) need not stop payment on, or replace, or refund a lost or stolen WUFSI Money Order unless (1) you fill in the face of the Money Order at the time of purchase, and (2) you report the loss or theft to Western Union Financial Services Inc. in writing immediately, and (3) You provide WUFSI with this original Money Order receipt issued by Western Union Financial Services Inc., Englewood, Colorado. For customer service, call 1-800-999-9660.

✱  1 9 2 1 0 9 1 0 5 7 8  ✱

LOAD THIS DIRECTION, THIS SIDE UP

LOAD THIS DIRECTION, THIS SIDE UP

EXIBIT 2

# Don't forget to wear your mask.



## CONCLUSION

1. Plaintiff is likely to succeed on merits of his claims.

2. That Plaintiff will likely suffer immediate harm relative to the facts and circumstances presented without it.

3. The balance of equities, i.e., health, security and safety of Plaintiff support an injunction.

15. Plaintiff states under penalty of law all facts stated herein are true and correct to the very best of his belief, knowledge and recollection.

Date:

Respectfully Submitted;

*Steven L. Stanley*

Steven L. Stanley

MP5/The Studios,

850 NE 81st Au., Suite 216

Portland, Or. 97213

503-957-4226

SWORN and SUBSCRIBED to before me this 4th day of February, 2021.

NOTARY PUBLIC

Ian Michael Holdt

OFFICIAL STAMP
IAN MICHAEL HOLDT
NOTARY PUBLIC - OREGON
COMMISSION NO. 1003210
MY COMMISSION EXPIRES AUGUST 18, 2024

(21)

# STAY SAFE.
# STAY HEALTHY.

To help prevent the spread of germs, we encourage you to follow these CDC recommended guidelines.



Wash your hands often.



Wear a face mask or other face covering.



Practice social distancing.



Stay home if you are sick.

If you have a question or need assistance, please call/email us or schedule an appointment so we can assist you during normal office hours.



GUARDIAN
MANAGEMENT LLC
A DIVISION OF GUARDIAN REAL ESTATE SERVICES LLC

# ARTHAUS EVENTS

## AT MILEPOST 5

## OPEN NOW

*Evenings // Weekends*

*5-10pm // 8am-10pm*

### SCHEDULE YOUR EVENT!

### *Hopes & Dreams:*

Want to host your own:

- **Workshops**
- **Exhibits**
- **Discussions**
- **Salons**
- **Classes**
- **Community**
- **Music**



## *Free to Residents!*

~Schedule Online ~

*email* **Milepost5events@gmail.com**

~Paper Signup Sheets Coming Soon~

## COVID-19

+

MASKS REQUIRED

SOCIAL DISTANCING

MAX. OCC. 6 PEOPLE

HAND SANITIZER



**Milepost5events@gmail.com**

**December 2020**

# MILEPOST 5

# FRIENDS MAKE THE BEST NEIGHBORS

## Love Living At Milepost 5?

Refer a friend to live at Milepost 5 and receive $250 when they move in!
Ask the leasing team for all the details.

Thank you for being our resident.

Professionally Managed By:

 GUARDIAN
MANAGEMENT LLC






# Milepost 5 Studios- NOW LEASING -SRO $725.00 per month

850 NE 81st Ave | Portland, OR 97213

Milepost 5 is an affordable housing community for creatives, developed for working artists of all disciplines. Located on a two-acre campus in Portland's Montavilla neighborhood, our community of over 100 renters works in dozens of artistic fields. Residents host monthly art openings, present plays, music, readings, workshops, and other events in the community spaces.

## AMENITIES

- Community garden
- Common area WiFi available
- Walking distance to Montavilla Park and Montavilla

- Wide ranging event schedule including art openings, plays, music, workshops, and readings
- Onsite coin operated laundry facility

**CONTACT US TODAY:**

503.333.3331 | TTY: 711

milepost5@gres.com

www.milepost5apts.com





**Guardian Management LLC is an equal opportunity provider and employer.**






# GUARDIAN
MANAGEMENT LLC

December 17, 2020

Dear Mr. Steven,

I was forwarded two letters to Mr. William Edgar of Greenspoon and Marder that you mailed to their offices directly about your concerns at Milepost 5 Apartments.

Thank you for bringing concerns to our attention about another resident within the building with medical needs that you have been assisting.  While we care for each resident at our properties and are sympathetic to residents with medical issues, as a property management company we are not involved in resident's medical care and treatment.  Please note that we cannot discuss other resident matters with another resident within the community.

The 2nd letter discusses concerns of residents in the community kitchen that were not socially distanced, and they also were not wearing masks over the Thanksgiving Holiday.  If you have more specific information of who might have been involved so that we can investigate this further.  As a property management company, we have put out the CDC guidance, require masks to be worn in the building and have closed all non-essential areas to reduce the spread of COVID 19.  It is unfortunate that some residents and or guest have chosen to not follow these safety measures in place.

Please direct any other concerns to our office at the property so that we can review and follow up if necessary.

Sincerely yours,

*Kelly paine*

Kelly Paine
Portfolio Manager
Guardian Management LLC

760 SW 9th Avenue, Suite 2200 Portland, OR 97205  •  P.O. Box 5668 Portland, OR 97228

o (503) 802.3600 • f (503) 802.3648 • tty 711 • www.gres.com

GUARDIAN REAL ESTATE SERVICES LLC DOES NOT DISCRIMINATE ON THE BASIS OF DISABILITY STATUS IN THE ADMISSION OR ACCESS TO, OR TREATMENT OR EMPLOYMENT IN, IS FEDERALLY ASSISTED PROGRAMS AND ACTIVITIES. GUARDIAN REAL ESTATE SERVICES LLC HAS DESIGNATED AGENTS TO COORDINATE COMPLIANCE WITH THE NONDISCRIMINATION REQUIREMENTS CONTAINED IN THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT'S REGULATION IMPLEMENTING SECTION 504. FOR MORE INFORMATION, CONTACT GUARDIAN REAL ESTATE SEVICES LLC AND REQUEST TO SPEAK WITH THE COORDINATOR FOR THE SPECIFIC COMMUNITY FOR WHICH YOU ARE INQUIRING.






# Greenspoon Marder LLP

William Edgar, Esq.
PacWest Center
1211 SW 5th Avenue, Suite 2850
Portland, Oregon 97204
Phone: 503.227.2805
Direct Phone: 503.878.8036
Email: william.edgar@gmlaw.com

October 28, 2020

Steven L. Stanley
850 NE 81st Avenue
Unit 216
Portland, OR 97213

Re:    Response to Your July 13 Letters
       Our File No. 63393.0007

Dear Mr. Stanley:

This letter is in response to your undated letter postmarked October 14, 2020. While your threats to file legal action continue, it is unclear as to what cause(s) of action you intend to allege or what facts support any such action. Equally unclear are your alleged damages, if any.

Your letter noted a vague reference to "1983" and civil rights, which I assume was intended to reference 42 U.S.C. § 1983 ("§ 1983").  However, I believe that must have been mentioned in error as § 1983 claims are generally limited to actions brought against government employees and/or entities for violating a plaintiff's civil rights.  They are most commonly used in excessive force cases against law enforcement personnel. Such claims are rarely brought against private parties because the statute is difficult to utilize against private entities and/or persons.

Notwithstanding the above, I have discussed your letter with my clients. They inform me that they received your complaint made to the Occupational Safety and Health Administration ("OSHA"). My client has responded to OSHA and provided them with the requested documents to rebut your claims. They have not heard anything further as of this writing.

I also wish to convey, that my clients do in fact have clear COVID-19 related mandates and guidelines that requires every employee and vendors to wear a mask. Their guidelines are consistent with those issued by both state and federal authorities. When government guidelines are adjusted or revised, my clients update their policies as well. They take this pandemic seriously, including all COVID-19 related precautions

In terms of enforcing their policies, I am sure you understand that my clients cannot be everywhere at all times and simply cannot strictly enforce policies (such as wearing

Boca Raton   Denver   Edison   Ft. Lauderdale   Las Vegas   Los Angeles   Miami   Naples
New York   Orlando   Portland   Scottsdale   Tallahassee   Tampa   West Palm Beach

Steven L. Stanley
October 28, 2020
Page No. 2

masks) at every single moment, against every resident and guest. No property management company has this capability.

On the above note, my clients are merely landlords and as such have limited authority to force residents and guest to comply with every rule, day in and day out. Certainly, when residents, guests or vendors are seen without masks, steps are taken to enforce the policies and guidelines.

Unfortunately, when a resident sees another resident or a vendor without a mask, they may make the inaccurate assumption that my clients are not enforcing their mask policy or that they are not doing everything they can. They are, but full compliance requires each person to take personal responsibility as well.

In response to your concern about the referral program offered to residents for referring a friend to Millepost 5, you must understand that the property has leasing deadlines required for its funding. Accordingly, occupancy rates are not a matter of pursuing "bottom line profits over health and safety" as you have erroneously alleged.

As to your claim about rental caps for a single room occupancy, my client's rents are consistent with the new rent limits released by the Oregon Housing and Community Services Department ("OHCS"). While your rent has not changed, rents for new residents have, as allowed by the OHCS. So there is no violation of legislative mandates as alleged.

My client will continue to cooperate with OSHA in their investigation. However, all other issues raised in your letter have been addressed herein. My client now considers this matter closed.

Very truly yours,

GREENSPOON MARDER LLP

/s/ William Edgar, Esq.

Emily Newton
845 NE 81st Avenue, Portland, OR 97213
971-407-8294
newton.emily@gmail.com

Date: 2/2/2021

To whom it may concern,

I am writing to you to express my deep concerns, frustration and anger at the constant noise, drama, and criminal activity of the residents of the studio apartments at Mile Post 5. I have become increasingly concerned at the amount of chaotic and alarming activity that is happening with a large number of residents at Mile Post 5. My husband and I purchased our home in early 2020 and have been living across from the apartment of Mile Post 5 for 12 months. Our initial understanding about Mile Post 5 was that it was an 'artist community' where residents lived and worked as a community - and as both artists and educators, my husband and I were very excited to be living across from a place such as this. It is now my understanding that Mile Post 5 is no longer an artist community, that the screening of residents is very different from what it used to be and that there is little or no 'community' building/events. Whilst we noticed some strange and concerning things when we first moved here, it has gotten far worse in the last 6 - 8 months.

We have experienced ongoing encounters with residents experiencing mental health issues; including verbal abuse, witnessing property damage (to Mile Post 5) and harassment of pedestrians and other people in the community. I have witnessed blatant littering; trash and cans thrown from residents' cars directly onto our neighbors property. I am regularly woken up in the early hours of the morning to shouting and commotion outside of our property. I have seen a half naked man at the back of my neighbors property, I have seen cars broken into, I have lost count of the number of used condoms found on the street (and surrounding streets). I have witnessed the body of a woman who OD'd in the apartments being removed from the building. I see police arrive and intervene every other week. I have also called the police a number of times when I have heard yelling, shouting and screaming coming from the apartments. I have put out a fire twice on the grounds in the height of summer; a combination of a cigarette butt and the lack of up-keep of the property. Residents regularly enjoy gathering on the corner of Oregon St and 81st to drink and smoke at all hours of the day. The list goes on and on.

At this point I am not sure what to do and who to talk to about the state of the situation with Mile Post 5 - I continue to notify the police when necessary, I have complained to the building manager about specific residents and I keep my distance from residents that scare me. I am concerned for my personal well being and the wellbeing (and value) of my property. I implore you to look into how residents are screened and vetted when applying to live in these apartments. I also want to know how Mile Post 5 is continuing the support of the artistic and small business community that it once prided itself upon.

Please do not hesitate to contact me with further questions or if you need any more information,

Emily Newton
(Property owner -  across from MilePost 5 on 81st Avenue)

**NEWS**

Jan. 22, 2020 pg. 9

# Rent Gouge

The state agency tasked with monitoring rents in affordable housing failed at two Portland buildings.

BY RACHEL MONAHAN  rmonahan@wweek.com

Oregon Housing and Community Services is a state agency with more than 170 employees, a budget of more than $1 billion a year in federal and state funds, and an executive director who makes $185,676 annually, and a mission to develop housing policy and provide stable and affordable housing to the most vulnerable Oregonians.

OHCS is a growing priority for state leaders, who expanded the agency's budget by more than $450 million this biennium. But according to several months of reporting by *WW*, the agency's doing a faulty job of protecting low-income tenants from rent gouging.

Making policy is easy. Enforcing it is hard. And observers say OHCS never created a system to reliably track whether landlords were following the rules.

"The pillar of affordable housing is that it's *affordable*, and the state agency charged with enforcing compliance of that most basic tenet can't apparently be counted on to enforce that most basic piece," says Margot Black, founder and co-chair of Portland Tenants United. "That's a problem."

In 2018, OHCS created a policy requiring most landlords it oversees to cap rent increases at 5 percent. (The agency oversees properties that receive federal tax credits.) That's on top of federal limits on absolute dollar amounts landlords may charge for some affordable housing.

But *WW* has documented instances in which OHCS failed to enforce those policies.

In two cases *WW* examined closely, the agency did nothing until the newspaper or Black's tenants' union called attention to the violations.

OHCS conducts a physical inspection and compliance review after the first year, and then the same type of inspection at one-, two- or three-year intervals.

Agency director Margaret Salazar acknowledges the examples *WW* brought to her attention show that her agency's oversight efforts have fallen short. "This is helping us understand what it takes to have an effective policy," Salazar says.

Black, the tenant advocate, says what she's seen raises enough questions that agency officials need to take a systemic look at all their properties. "It's clear," she says, "that the state must do a full audit of all properties to directly verify the rent amounts and increases."

Black appears to be right. Without too much difficulty, *WW* found apartments in violation of OHCS rules, even though the agency seemed unaware of them.

The first were at the tax credit-subsidized Milepost 5, an artists' enclave in Montavilla, at 850 NE 81st Ave. Community Development Partners refurbished the building with help from the low-income housing tax credit program.



OVERCHARGED: Tenants at Milepost 5, an artists' enclave in Montavilla, were paying too much.

That meant it was required to abide by hard caps on the rent it was charging: $693 for single room occupancy apartments, as of September 2019. Instead, the developer was charging far above the limit for some of the rooms.

In October of last year, Chellema Qolus, who rents a single room occupancy apartment there, paid $825, almost 20 percent more than she should have under OHCS policy.

"I think a lot of people who live in [affordable] buildings don't realize what type of housing it is and what our rights are," Qolus says. "We are very vulnerable."

Last month, after Portland Tenants United alerted state regulators, the landlord rescinded the rent hike, reducing the rent to no more than $693 for all but two units in the building. (Community Development Partners declined to provide an explanation for the higher rent.)

To OHCS's credit, the agency penalized the company by stripping away its 2019 tax credits for multiple apartments at the complex. But that didn't stop OHCS from approving new tax credits last week for the same developer on a huge new project in the Rockwood neighborhood of Gresham.

"We spent a lot of time discussing [this] inside the agency," Salazar says. "If we were to turn our backs on this project at this stage, we would be harming the residents who need stable housing in that community. It's always that balancing act."

Another example is Pacific Tower Apartments in Old Town, which receives federal tax credits. In May, the landlords—MRA Investments LLC and Pacific Tower Associates—hiked rents 9 percent, nearly twice the allowed amount.

"THE PILLAR OF AFFORDABLE HOUSING IS THAT IT'S *AFFORDABLE*."

—MARGOT BLACK, PORTLAND TENANTS UNITED

After *WW* pointed out the increase to OHCS in December, seven months after the rent increase took effect, the agency said it would enforce the rules and get renters' money back.

But more than six weeks after *WW* brought the example to officials' attention, OHCS could not confirm the tenants had received refunds.

A representative for the landlords says they have rescinded future rent increases and are now following the requirements for the prior rent increase.

"The regulations are complex, and there was a misinterpretation as to how to apply them," says Christopher Lordino, portfolio manager for MRA. "We are making all steps to correct it."

OHCS spokeswoman Nicole Stoenner says the agency is already scheduled to conduct one of its regular reviews of the property next month.

For Ruth Ann Barrett, a Pacific Tower tenant, the agency acted too late. She spent more than 45 percent of her income on rent and fears future rent increases. So she moved out last month.

"I'd be out on the street by 2021," she says.

Oregon Gov. Kate Brown, who has increased the agency's budget, defended its work to *WW*. "While there is clearly still more work to be done to address the housing crisis in Oregon, it's my understanding that OHCS policies regulating rent increases for affordable housing properties go well beyond what is required in federal statutes," the governor's spokesman Charles Boyle said.

House Speaker Tina Kotek went further.

"It's significant that the state has required a review process for any rent increases over 5 percent," says her spokesman Danny Moran. "We have to continue to monitor that the system is working as intended. These rent caps must be properly enforced." **WW**

*The nonprofit Journalism Fund for Willamette Week provided support for this story.*



*S & M BOTANICS*

*Steven L. Stanley/Herbalist-Plant Doctor-Animal Behavior Therapist*



Ginseng Root

Herbal Lectures-Workshops-Seminars-Consultations
Herbal Medicinals/Wild American Ginseng Products/Leather-Furs
Custom Order Buckskin Garments/Wholesale Apothecary Products

*Under "murder's" section P.6*
*WW 10 23/18*

**LANDLORD WAFFLES ON PROMISE TO PAY ARTISTS' MOVING COSTS:** Milepost 5, an affordable housing development for artists on Southeast 82nd Avenue, issued a notice to tenants this month that appeared to backtrack on a pledge to pay their moving costs. The tenants are being forced to move because they make too much money—the new owner of the property, a developer called Community Development Partners, wants to qualify for a government subsidy as affordable housing. Last year, after being contacted by *WW*, CDP pledged to pay moving costs. When contacted by *WW* again this week, the company renewed its pledge to cover relocation expenses of the three tenants it says must move out because their income is too high. The property manager had given an apparently misleading notice to at least one of the tenants.

**ARTISTS FEEL CHILL AT MILEPOST 5:** Residents of Milepost 5, an affordable housing complex for artists, have been suffering from heat outages. It's the latest in a string of problems at the complex. Community Development Partners, an affordable housing developer that owns the complex, has already offered tenants in 27 of the apartments repayments for failing to notify them before entering units as required under state housing law. They're also offering tenants compensation for janitorial, security and maintenance issues, after tenants demanded it. But in the case of heat, the complex's management company has blamed "someone in the building" for "tampering with the flow valves that control the boiler," according to a Nov. 22 letter to tenants.