FILED May

02 APR '21 13:33 REVD USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON, PORTLAND DIVISION


Steven L. Stanley,              Case No: 3:21-cv-143-MO
             Plaintiff,

Vs.                         Judge Michael Mosman

Community Development

Partners, et. al.,              PLAINTIFFS BRIEF
          Defendants.          ARTICLE III STANDING


        Now comes Plaintiff and submits a Brief in
Support of his Article III standing for purpose of a
Sec. 1983 cause of action presenting the facts and
law in support of standing in the following attached
Memorandum.

                    Respectfully Submitted;
                    Steven L. Stanley
                    Steven L. Stanley, pro se Plaintiff
                    MP5 Studios
                    850 NE 81st Ave., Suite 216
                    Portland, Or. 97213
                    (503) 957-4226


Pg. 1

## MEMORANDUM

I    Introduction:

A.    Plaintiff brought this cause of action for numerous violations of Constitutional rights and pursuant to FHA Enforcement by private person pursuant to 42 u.s.c., Sec's, 3610 (a), 3613 (a)(1)(A-B). This case can only proceed forward once the Article III question of standing is determined by the Court. Plaintiff submits the Article III requirements have been fully satisfied and Preliminary Injunction is needed to prevent, abate further present and future injury which is an ongoing circumstances situation with traceability directly to defendants acts, omissions, failure(s), policy and practices by virtue of their State Actor Status. Plaintiff hereby incorporates by reference all of the allegations contained in his First cause of action (Complaint, doc. 2) and his Answer/Cross/Counterclaim to defendants Answer in Opposition to Preliminary Injunction filed by Plaintiff, doc. 19). Plaintiff has made very clear his standing in bringing this cause of action and has satisfactorily met the necessary requirements and will set forth facts that fully support his standing in this case.

1.)   The Ninth Circuit has held that an organization can establish standing under FHA by demonstrating (a.) "frustration of its organizational mission". In the instant case plaintiff filed this action under the "class of one" theory naming several "interested" party organizations. But more importantly, since late Summer of 2019 Plaintiff and Evan Wellington organized our MP5 "Tenants Association/Union" and had been acknowledged by CDP and Mr. Bradford Long who was defendants chief liason for CDP negotiating directly with our organization of which Plaintiff was and still is 'consigliere' to/in our Tenants Association in a struggle with defendants over hability issue and "rent gauging". This evidence is placed in Plaintiffs filings and before the Court for review. And (b) diversion of its (organizational) resources to combat the particular housing discrimination in question (habitability, discrimination, and equal protection issues as result of defendants actions). Smith v. Pacific Properties & Development Corp., 358 F.3d 1097, at 1105 (9th Cir. 2004); Fair Housing of Marin v. Combs, 285 F.3d 899, at 905 (9th Cir. 2002); Havens Realty Corp. v. Coleman, 455 U.S. 363, at 372, 375-76, 378-79, 102 S. ct. 1114 (1982).

   Defendant Guardian MP5 resident management is fully aware as they officiate over the regularly held Tenants Association meetings in MP5 Art Haus

Pg. 3

and the fact of which is undeniable. While it is true that due to the frustration of worsening conditions and not achieving resolution of issues we have lost many dedicated members who have simply given-up and opted to move out in droves, some after only less than 5-6 months residency. However, Mr. Evan Wellington in MP5 Rm. 206 (Tenant Union Organizer in the employ of "Portland Tenants United" and Plaintiff have remained to struggle on (see Exhibit 1 attached herewith). Out of frustration Mr. Wellington has stepped back and Plaintiff has taken lead role and in this action representing MP5 Tenants Association / union members. Thus Plaintiff's established standing number 1. See also Alexander v. Riga, 208 F.3d 419 (3d Cir. 2000).

The inquiry requires attention to the totality of facts and circumstances and whether defendants actions were reasonable under the protections of FHA, ADA provisions and Constitutional rights cited as being violated. See, e.g., Graham v. Conner, 490 U.S. 386 (1989); Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005); Lassiter v. City of Bremerton, 556 F.3d 1049, 1053 (9th Cir. 2009). And, whether the hability conditions of which Plaintiff complains poses a threat to the health, safety, security of not just Plaintiff but 'Tenant Association' members, MP5 The Lofts Home Owners Association,

and surrounding home/property owners who have
voiced their concerns. See Equal Rights Ctr. v. Post
Properties, Inc., 633 F.3d 1136, at 1138 (DC. Cir. 2011).

2.)     Plaintiff has established sufficient facts and
with best evidence submissions of an existing, real
and immediate threat to health, safety, security
and future injury to satisfy injury-in-fact require-
ment. City of L.A. v. Lyons, 461 U.S. 95, at 103-04,
103 S.Ct. 1660, 1665-66 (1983). Moreover, no authority
even remotely suggests that proximate causation
applies to the doctrine of standing. Instead, even
harms that flow indirectly from the action in
question can be said to be "fairly traceable" to that
action for standing purposes. Vermont Agency of
Natural Resources v. U.S. ex rel. Stevens, 529 U.S. 765,
at 771, 120 S.Ct. 1858, at 1861-62 (2000) (quoting
Simon v. Eastern Ky. Welfare Rights, 426 U.S. at
41-42, 96 S.Ct. 1917, at 1926 (1976); Loggerhead
Turtle v. County Counsel, 143 F.3d 1231, at 1250-51
(11th Cir. 1998); The Pitt News v. Fisher, 215 F.3d 354, at
360 (3d Cir. 2000). Plaintiff has demonstrated not
only real and immediate threat (that is not solely
resting on the pistolero of Rm. 328) but of future
injury as presented evidence so indicates in
regard to those specific residents cited throughout
Plaintiff's pleadings in order to satisfy injury-in-

fact. Myers, 461 U.S. 95, at 103-04, 103 S.ct., at
1665-66. As Plaintiff's injury may even be
indirect, the Complaint did indicate that the
injury[s] is indeed "fairly" traceable to defendants
acts and omissions. <u>Village of Arlington Heights
V. Metro Housing Development Corp.</u>, 429 U.S. 252,
260-61, 97 S.ct. 555, 561 (1977) quoting <u>Warth v.
Seiden</u>, 422 U.S. 490, at 498-99, 95 S.ct. 2197, at 2205
(1975).

        While "post exposure to the illegal conduct does
not always in itself show a present case or
controversy regarding injunctive relief... it certainly
does in the instant case with accompanied by the
present "adverse effects" as Plaintiff continues
taking evidentiary photos of the here and now
with no abatement of uninhabital conditions.
See <u>O'shea v. Littleton</u>, 414 U.S. 488, 495-96, 94
S.ct. 669, at 675-76 (1989); <u>Johnson v. Bd. of Regents</u>,
263 F.3d 1234, 1265 (11th Cir. 2001). Additionally, the
evidence shows present conditions reflect by inference
or direct evidence a sufficient likelihood that Plaintiff
will continue to be affected by the allegedly
unlawful conduct in the future while all the while
defendants act under color of state law. Because
injunctions regulate future conduct, a party has

standing to seek injunctive relief has shown a real and immediate as opposed to conjectural or hypothetical threat of future injury. Church v. City of Huntsville, 30 F.3d 1332, at 1337 (11th cir. 1994); American Postal Workers Union v. Frank, 968 F.2d 1343, at 1346 (1st cir. 1992). Neither does the Courts analysis in Lyons, 461 U.S. 95 pose a bar to Plaintiff's standing to sue for prospective injunction or declaratory relief.

Defendants practice in fulfilling the contractual arrangement HUD regulatory non-discretionary compliance reportage established in 42 u.s.c. Sec. 1437f et seq., as with the Housing & Community Development Act of 1987, see Pub. L. No. 100-242, Sec. 262(a), 101 stat. 1815, 1890-91 (1988) (codified as amended at 42 U.S.C., Sec. 1437f (c)(8). See also, 24 CFR, Sec. 981.1 (b)(1), 982.314, 982.353, 982.355. Defendants are regulatoryly mandated in acting in accordance with such provisions as the "opt-out notice", 42 U.S.C., Sec. 1437(c)(8)(A)(B)(c); Multifamily Assisted Housing Reform & Affordability Act of 1997, Sec. 524(d)(1). These all are governmental regulatory schemes attached to the tax credit low income economic benefits that direct, guide and control defendants conduct and does not sanction non-compliance or prohibitive conduct, thus a direct nexus, motive and intent or moving force

behind defendants prohibitive conduct or risk losing
their bestowed economic advantage in the real estate
market place. It is not rocket science to see the
nexus and causative effect in context of Plaintiff's
allegations and claims. Defendants became a
willful partner in this state regulatory cycle and
simply out of Capitalist greed not motive or concern
for the poor and low income families, rather, to
take the economic advantages in gaining a toe hold
in a highly competative market place. Only a focused
discovery of documents can lead to further exposure
of unlawful conduct and fraud in their reportage
data and contractual applications. Defendants
were previously caught in unlawful conduct due to
lack of regulatory oversight by OHCS (see
Exhibit 2 attached hereto) as proof evidence
of state actor status governed by state.

Bearing in mind that MP5 Studios has become
so inundated, especially on the third floor with
gang-bangers selling heroin and meth, a pimp
operating his prostitution ring harbored comfortably
in MP5 only as a result of defendants desperation
to satisfy state regulatory obligations for re-
certification by opening up MP5 to a "no vetting"
requirement engendering a dangerous, hostile, un-
healthy environment rife with illicit narcotics and

unlawful firearms with one tenant stating an assault
AK-47 was dropped in hallway being carried through.
Out of frustration many Association/Union members
have simply opted to leave, move-out as with
Plaintiff having to employ "constructive eviction" for
his own safety as he has been targeted for his
outspoken comments at tenants meeting and the
bad guys aware Plaintiff has been photographing
them. It is too dangerous to even enter the third
floor to identify the rooms to be targeted containing
the narcotics and firearms being stored so PPB can
use his affidavit to obtain search warrants of the
specific rooms (no-knock warrants due to presence
of firearms). This is the state of affairs and only
as a direct/proximate result of defendants prohibited
conduct and in violations of the state contracted
regulatory provisions. Defendant Guardians two
MF5 resident mgr., Jacqueline King and Brad Coupchick
are fully aware of these matters as they have been
repeatedly warned, been provided facts, details and
complaints by residents at every regularly scheduled
residents meeting and simply choose to ignore as
the rooms (rental) are being emptied faster than
defendants can fill them falling short on their
regulatory compliance and standards to be met for
recertification leaving the only alternative but

work discretely and clandestinely with PPB units to clean house. (See Defendants Response to Plaintiffs "First Admissions" Exhibit 3, Admissions Requests 6, 7, 10, 11).

3.)    Article III must also be determined as of the time which Plaintiff's complaint was filed (Feb. 1, 2020 thru Feb. 1, 2021) and of which Plaintiff was compliant. See Friends of the Earth, Inc., v. Laidlaw. Envtl. Serv's (TOC), Inc., 528 U.S. 167, at 180, 120 S.ct. 693, at 704 (2000); White v. Lee, 227 F.3d 1214, 1243 (9th 2000). And, subsequent events do not deprive the court of jurisdiction. County of Riverside v. McLaughlin, 500 U.S. 44, at 51, 111 S.ct. 1661, 1667 (1991); Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1061 (5th Cir. 1991). Under Lyons analysis the standing inquiry also extends as of "the time the second amended complaint was filed" and Plaintiff's pleading featured the identical allegations regarding defendants and tenants (Rm. 316, 215) unlawful conduct, in fact it increased in severity, ferocity and pervasive continuation to a whole new level. In any case, allegations and amendments as with supplement to and joinder of partys relate back to the specified time period under F.R.C.P., Rule 15 (c)(2). See Focus on Family v. Pinellas Suncoast Transit, Auth., 344 F.3d 1269 (11th Cir. 2003); U.S. v. Duffus, 174 F.3d 333, 337 (3d Cir. 1999); U.S. v. Craycraft, 167 F.3d 451, at 457 (8th Cir. 1995).

Under the given facts, evidence and ongoing circumstances, further irreparable injury is not merely likely, rather, it is continous – ongoing and contnue so in absence of injunction relief. Winter, 129 S.Ct. at 376.

4)   Lastly, Plaintiff has stated a substantive right whether in discrimation (habitability), equal protection or 8th Amendment, defendants actions under the cirumstances violated the "basic concept underlying the Eighth Amendment which is nothing less than the dignity of man" and amounts to the gratuitous infliction of unwanted, wanton, unnecessary and needless pain and suffering. Trop v. Dulles, 356 U.S. 86, at 100 (1958). That Plaintiff's Defendants, complained acts/inaction, failure and omissions to take remedial steps and action within their tool box of options and deliberate indifference to his health, safety, security and habitital concerns have not abated even up until present day whereby knowingly subjecting Plaintiff to substantial risk of harm without justification or legitimate social, government interest constituting a punitive nature – cruel and unusual punishment prohibited under Eigth Amendment. Whitley v. Albers, 475 U.S. 312, 319 (1986); Farmer v. Brennan, 511 U.S. 825, at 842 (1994); Wilson v. Seiter, 501 U.S. 294 (1991); Hudson v. McMillian, 503 U.S. 1, at 8 (1992).

Pg. 11

Despite defendants annoying efforts at attempting to misdirect from the true issues, Plaintiff actually holds a dual standing position in that one he is a Tenant Assoc./ Union member thus representing the interests of his associate members, and two, has clearly stated a concrete and particularized injury that affects him in a direct personal and individual way in regard to him being directly targeted by those persons in the room numbers he consistently cited for deliberate and ongoing harassment, intimidation, vandalism to his domicile (feces smeared across his door), damage to his outer wall from objects being beaten against his room wall as examples) which satisfies particularization element which was "actual" and remains "imminent" in continued conduct. "Concreteness" as a "de facto" injury, i.e. to actually exist and what submitted evidence clearly supports. See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 134 S.Ct. 2334, L.Ed. 2d, at 257-260 (2014); Lujan, 504 U.S., at 560, n. 1; e.g., Spokeo, 135 S.Ct. 1892 (2015). And as a matter of law "concrete" injury need not be tangible injury. See, e.g., Pleasant Grove City v. Summum, 555 U.S. 460, 129 S.Ct. 1125 (2009). As the Court has stated; while Article III requires a concrete injury even in context of a statutory violation. Nonetheless, does not mean

that the risk of real harm cannot satisfy that requirement. Clapper v. Amnesty Intl. USA, 568 U.S. 398 (2013); Spokeo, supra, 135 S.ct 1892. The violation of a procedural right such as due process, or substantive right like equal protection, Eighth Amendment granted by statute (habibility for example, the right to peaceful enjoyment of residence rooted in common property law may also count) can be sufficient in such circumstances as in this case, Plaintiff need not allege any additional harm beyond the one identified by Congress, Federal Election Commn v. Atkins, 529 U.S. 11, 11-25 (1998). In spite of defendants spin artistry, Scrabble with words, reinvention restating Plaintiffs claims connotating something other than; defendants have produced no evidence other than sworn to falsehood Declarations, no documents in contradiction of the voluminous evidence Plaintiff has put before this Honorable Court but a slew of just a chery picked slew of a few words or a sentence taken out of the case context as opposed to the full case text actually supporting Plaintiff mistakingly believing this Court a misinformed, unseasoned and unwise jurist sitting on the bench.

Even FHA's anti discrimination/retaliation provision makes it unlawful " to coerce, intimidate, threaten, or interference with any person in the exercise or

enjoyment of, or on account of his having exercised or enjoyed ... any right granted or protected by Sec.3603, 3604, 3605, or 3606 of this title". 42 U.S.C., Sec.3617. Like all antiretaliation provisions, it provides protections Not because of who people are, but because of what they do. Burlington Northern & Sante Fe Alway Co. v. White, 548 u.s. 53, 63, 126 S.ct. 2405 (2006). As Plaintiff clearly put forth, it is defendants acts, failures to act, omissions that became a custom and practice ("interference") as a proximate cause of injury and further encouraged (and continues) tenants misconduct as there was nor is consequences to the ongoing lawless, why, ... because we need rooms filled at all costs to be in accordance with those HUD and FHA directives to act in compliance with those standards attached to the government agreement to receive continued economic benefits of applying and granted those tax credit low income certification. It behooves when how defendants believe that there is no govermental entwinement or interdependance with state when theyaccept a tenant with a Sec. 8 or agency rent assistance vouchers wherein a tenent pays only a certain percentage of the total rent and in cases such as Plaintiffs, he was not required to pay anything at times. They question becomes, how can defendants operate at

such a huge financial loss. Oh!! Plaintiff gets it,
something called State, government subsidization
and obviously does not make an interdependant endeavor
with state, agents with passage of money - "funding"
between the two party's implicating banking and other
regulatory control structures at directives of the State.
Simply because Plaintiff utilized tactical strategy as has
defendants in implementing misdirection in using
verbage like "funding" which of course leads to
that causative nexus to that contractual relationship,
"agreement - arrangement" with State, agents then
stating his claim as "discrimination" - "uninhabability" -
disparate - impact treatment" which then intersects
with the State actors, i.e., "symbiotic" "entwinement"
with State, agents. Plaintiff merely mis-directed
defendants to assume one thing rather than what the
actual web in which they are now caught in. It
was Plaintiff's tactical and strategical game plan
in putting this case together with a little stealth
thrown in. Creating an allusion and yet the
evidence clearly shows the defendants were given
full warning for at least 6 months, detailed complaints
of which defendants had full knowledge of and simply
refused to act and chose instead to continue on with
their unlawful conduct as a willful participant,
Parnership with their State lordship masters.

The allegation of a violation of a statutory right Is sufficient injury to qualify for standing conferring Article III standing in and on its own on a plaintiff who hasn't suffered concrete harm. Injury-in-fact is met when plaintiff shows that he suffered an invasion of a legally protected interest and injury was concrete and particularized as well as actual or imminent such as what Plaintiff has demonstrated in facts and evidence. e.g., Spokeo, Inc. V. Robins, 136 S.Ct. 1540 (2016). As Justice added, "standing doctrine applies to both private citizens seeking to vindicate private rights as well as those who alleged violations of public rights. Id. On the flip side, in dissent Justice Ginsberg and Sotomayor argued it was not necessary to remand the case because the evidence presented was sufficient to prove the injury at issue was concrete and particularity need not be considered separately. Nonetheless, Plaintiff clearly established a particularized property interest, i.e., uninhabitability, and equal protection in resulting disparate-impact, treatment as consequence or proximate cause of defendants acts, omissions, failures, policy and practice resulting in tangible real time injury-in fact. The members of Plaintiff's MP5 Tenants Assoc. Union and neighbors Plaintiff likewise represents, likewise have a legitimate entitlement claim of a

'property interest' ("habitability", stolen property and damaged property), therefore to the right to peaceful enjoyment of residence as with entitlement to the desired aid sought.

B.                              CONCLUSION

In sum, there is palpable evidence that where the State is entwined in a symbiotic interdependence and contractually regulates the private actor to take particular actions contingent/attached to the agreement—arrangement, e.g., under certain specifically delineated circumstances — then it can be said at this stage as is the case here, that acting in accordance therewith with governmental directive the private actor is but a surrogate for the State, and the tie between them is sufficiently strong for the nexus/joint action test to be satisfied. When there is record evidence that the State itself unmistakably directed the private actor take particular actions such as annual recertification of compliance or risk losing the economic advantage, benefits and thus creates a genuine material fact triable issue. Brentwood Academy V. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, at 297-98, 121 S.Ct. 924, at 931 (2001).

While government entities may not be prevented, through disparate-impact liability under FHA from

achieving legitimate objectives as with health and safety codes for example, defendants actions were nevertheless prohibitory under statutory and Constitutional rights and FHA mandatory statutory mandated provisions with directive compliance so as to impune liability. See, e.g., Texas Dept. Housing & Community Affairs V. Inclusive Communities Project, 135 S.ct. 2507 (2015) (case citations). But for defendants willful participation and endeavor (tax credit low income housing) engaging in partnership with State in a Tradionally function of State and agents, Defendants and bestowed with state actors status the prohibitive conduct would not have occured. In sum, there are genuine factual issues as to whether state action is presented in Plaintiffs case and there are unanswered questions of fact regarding the proper characterization of the actions for the jury to decide. Rowe V. Tennessee, 609 F.2d 259, at 265 (6th Cir. 1979); Gibson V. City of Chicago, 910 F.2d 1510, at 1517 (7th Cir. 1990); Goldstein V. Chestnut Ridge Volunteer Fire Co., 25 F.3d 1029 (4th Cir. 1990); Brentwood Acad. V. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, at 297-98, 121 S.ct. 924, at 931 (2001)

 Defendants appear to place a higher pleading standard to FRCP, Rule 8(a) even after Iqbal and Bell Atlantic, and requires that Plaintiffs need not plead detailed factual allegations to survive a motion to dismiss, but still must provide more than mere labels and conclusions

or formalistic recitation of elements of a cause of action for complaint to be considered adequate. Bell, at 738; Iqbal, at 678. Each allegation must be simple, concise, and direct, no technical form is required, consistent with Rule 8(a) provided that it "gives the the defendants fair notice of what the claim is and grounds upon which it rests. Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512, 122 S.Ct. 992 (2002); Lindsey v. Yates, 498 F.3d 434, 439-440 (6th Cir. 2007); Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197 (2007). The Bell Court, 550 U.S. 544 (2007) still found the rationale and validity in Swierkiewicz still to be valid as with Iqbal, 556 U.S. 662 (2009). See also Williams v. Richland Cnty. Childrens Serv's, 489 Fed. Appx. 848, at 852 (6th Cir. 2012). The evidence alone shows defendants had full knowledge of Plaintiffs complaints and relationship to the claims months in advance and was tolerant in giving them ample opportunity to change their evil ways even to the extent of assisting defendants giving case citations to read so as to comprehend and understand the nature and grounds upon which his claims rest. Plaintiff followed every legal protocol and effort at resolution of the presented issues with full knowledge and now to challenge "plausibility" in stating a proper claim is beyond absurd, has no truth in fact or legal merit.

Respectfully Submitted;

Steven L. Stanley

Steven L. Stanley, pro se Plaintiff

MPS Studios, 850 NE 81st Av., Suite 216

Portland, Or. 97213

(503) 957-4226

## CERTIFICATE OF SERVICE

I hereby certify a true and correct copy of the foregoing
Article III Brief was hand delivered to U.S. District
Court, Mark O. Hatfield Courthouse, 1000 SW Third Ave.,
Portland, Or. 97204 and to the following this 2nd day
of April, 2021.

cc:  Atty. Christopher Drotzmann

Davis Rothwell Earle and Xo'chichca P.C.

200 SW Market St., Suite 1800

Portland, Or. 97201

U.S. Mail, postage prepaid

Steven L. Stanley

Steven L. Stanley — Plaintiff

Pg. 20

Exhibit 1

503-836-7881
503-

Evan Wellington
Organizer

evan@pdxtu.org
503 · 432 · 0880

# PORTLAND
# TENANTS
# UNITED

pdxtu.org

**Tenant Power  ·  Tenant Solidarity**

# NEWS

Jan. 22, 2020 pg. 9

# Rent Gouge

The state agency tasked with monitoring rents in affordable housing failed at two Portland buildings.

BY RACHEL MONAHAN  rmonahan@wweek.com

Oregon Housing and Community Services is a state agency with more than 170 employees, a budget of more than $1 billion a year in federal and state funds, an executive director who makes $185,676 annually, and a mission to develop housing policy and provide stable and affordable housing to the most vulnerable Oregonians.

OHCS is a growing priority for state leaders, who expanded the agency's budget by more than $450 million this biennium. But according to several months of reporting by *WW*, the agency's doing a faulty job of protecting low-income tenants from rent gouging.

Making policy is easy. Enforcing it is hard. And observers say OHCS never created a system to reliably track whether landlords were following the rules.

"The pillar of affordable housing is that it's *affordable*, and the state agency charged with enforcing compliance of that most basic tenet can't apparently be counted on to enforce that most basic piece," says Margot Black, founder and co-chair of Portland Tenants United. "That's a problem."

In 2018, OHCS created a policy requiring most landlords it oversees to cap rent increases at 5 percent. (The agency oversees properties that receive federal tax credits.) That's on top of federal limits on absolute dollar amounts landlords may charge for some affordable housing.

But *WW* has documented instances in which OHCS failed to enforce those policies.

In two cases *WW* examined closely, the agency did nothing until the newspaper or Black's tenants' union called attention to the violations.

OHCS conducts a physical inspection and compliance review after the first year, and then the same type of inspection at one-, two- or three-year intervals.

Agency director Margaret Salazar acknowledges the examples *WW* brought to her attention show that her agency's oversight efforts have fallen short. "This is helping us understand what it takes to have an effective policy," Salazar says.

Black, the tenant advocate, says what she's seen raises enough questions that agency officials need to take a systemic look at all their properties. "It's clear," she says, "that the state must do a full audit of all properties to directly verify the rent amounts and increases."

Black appears to be right. Without too much difficulty, *WW* found apartments in violation of OHCS rules, even though the agency seemed unaware of them.

The first were at the tax credit–subsidized Milepost 5, an artists' enclave in Montavilla, at 850 NE 81st Ave. Community Development Partners refurbished the building with help from the low-income housing tax credit program.

That meant it was required to abide by hard caps on the rent it was charging: $693 for single room occupancy apartments, as of September 2019. Instead, the developer was charging far above the limit for some of the rooms.

In October of last year, Chellema Qolus, who rents a single room occupancy apartment there, paid $825, almost 20 percent more than she should have under OHCS policy.

"I think a lot of people who live in [affordable] buildings don't realize what type of housing it is and what our rights are," Qolus says. "We are very vulnerable."

Last month, after Portland Tenants United alerted state regulators, the landlord rescinded the rent hike, reducing the rent to no more than $693 for all but two units in the building. (Community Development Partners declined to provide an explanation for the higher rent.)

To OHCS's credit, the agency penalized the company by stripping away its 2019 tax credits for multiple apartments at the complex. But that didn't stop OHCS from approving new tax credits last week for the same developer on a huge new project in the Rockwood neighborhood of Gresham.

"We spent a lot of time discussing [this] inside the agency," Salazar says. "If we were to turn our backs on this project at this stage, we would be harming the residents who need stable housing in that community. It's always that balancing act."

Another example is Pacific Tower Apartments in Old Town, which receives federal tax credits. In May, the landlords—MRA Investments LLC and Pacific Tower Associates—hiked rents 9 percent, nearly twice the allowed amount.

> **"THE PILLAR OF AFFORDABLE HOUSING IS THAT IT'S *AFFORDABLE*."**
> —MARGOT BLACK,
> PORTLAND TENANTS UNITED

After *WW* pointed out the increase to OHCS in December, seven months after the rent increase took effect, the agency said it would enforce the rules and get renters' money back.

But more than six weeks after *WW* brought the example to officials' attention, OHCS could not confirm the tenants had received refunds.

A representative for the landlords says the agency has rescinded future rent increases and are now following the requirements for the prior rent increase.

"The regulations are complex, and there was a misinterpretation as to how to apply them," says Christopher Lordino, portfolio manager for MRA. "We are making all steps to correct it."

OHCS spokeswoman Nicole Stoenner says the agency is already scheduled to conduct one of its regular reviews of the property next month.

For Ruth Ann Barrett, a Pacific Tower tenant, the agency acted too late. She spent more than 45 percent of her income on rent and fears future rent increases. So she moved out last month.

"I'd be out on the street by 2021," she says.

Oregon Gov. Kate Brown, who has increased the agency's budget, defended its work to *WW*. "While there is clearly still more work to be done to address the housing crisis in Oregon, it's my understanding that OHCS policies regulating rent increases for affordable housing properties go well beyond what is required in federal statutes," the governor's spokesman Charles Boyle said.

House Speaker Tina Kotek went further.

"It's significant that the state has required a review process for any rent increases over 5 percent," says her spokesman Danny Moran. "We have to continue to monitor that the system is working as intended. These rent caps must be properly enforced." **WW**

*The nonprofit Journalism Fund for Willamette Week provided support for this story.*



**OVERCHARGED:** Tenants at Milepost 5, an artists' enclave in Montavilla, were paying too much.







**S & M BOTANICS**

*Steven L. Stanley/Herbalist-Plant Doctor-Animal Behavior Therapist*

Ginseng Root

Herbal Lectures-Workshops-Seminars-Consultations
Herbal Medicinals/Wild American Ginseng Products/Leather-Furs
Custom Order Buckskin Garments/Wholesale Apothecary Products

**LANDLORD WAFFLES ON PROMISE TO PAY ARTISTS' MOVING COSTS:** Milepost 5, an affordable housing development for artists on southeast 82nd Avenue, issued a notice to tenants this month that appeared to backtrack on a pledge to pay their moving costs. The tenants are being forced to move because they make too much money—the new owner of the property, a developer called Community Development Partners, wants to qualify for a government subsidy as affordable housing. Last year, after being contacted by *WW*, CDP pledged to pay moving costs. When contacted by *WW* again this week, the company renewed its pledge to cover relocation expenses of the three tenants it says must move out because their income is too high. The property manager had given an apparently misleading notice to at least one of the tenants.

**ARTISTS FEEL CHILL AT MILEPOST 5:** Residents of Milepost 5, an affordable housing complex for artists, have been suffering from heat outages. It's the latest in a string of problems at the complex. Community Development Partners, an affordable housing developer that owns the complex, has already offered tenants in 27 of the apartments repayments for failing to notify them before entering units as required under state housing law. They're also offering tenants compensation for janitorial, security and maintenance issues, after tenants demanded it. But in the case of heat, the complex's management company has blamed "someone in the building" for "tampering with the flow valves that control the boiler," according to a Nov. 22 letter to tenants.

*[handwritten: Exhibit #2 Page 2 Order Muriel's wate Mon 11/23/11]*

EXHIBIT 2, pg 3

# Oregon

Kate Brown, Governor

**Department of Consumer and Business Services**
Oregon Occupational Safety & Health Division (OR-OSHA)
350 Winter St. NE, Room 430
PO Box 14480, Salem, OR 97309-0405
Phone: (503)378-3272
Toll Free: 1-800-922-2689
Fax: (503)947-7461
osha.oregon.gov

October 14, 2020

Rec'd 10/19/20
(mon.)

Steven Stanley
850 NE 81st, Suite 216
Portland, OR 97213

We received your complaint regarding working conditions at Guardian Management LLC. A letter has been sent to the company requesting that these conditions be corrected and that they notify us within the next five (5) days when these corrections have been completed. We would appreciate your evaluation of any action taken by the company before fifteen (15) days.

Enclosed is a copy of the form on which your complaint information was written. Please read the form carefully and sign your name on the signature line. Return the entire complaint form within 10 days to this office in the enclosed self-addressed, postage-paid envelope.

Oregon law prohibits employers from discriminating against employees who lodge complaints against their employer for unsafe or unhealthful work conditions. If you have been treated in a discriminatory manner because of your complaint, you may file a discrimination complaint directly with BOLI/Civil Rights Division, Portland State Office Building, 800 NE Oregon St., #32, Portland, OR 97232, 971-673-0761. Any such complaint must be filed with one of these agencies within ninety (90) days after you have reasonable cause to believe you have been discriminated against.

If you have any questions, please contact me.

Penny Wolf-McCormick
Health Enforcement Manager
OR-OSHA Portland Field Office
16760 SW Upper Boones Ferry Rd, Suite 200
Tigard, OR 97224
503-229-5910
PENNY.L.WOLF-MCCORMICK@oregon.gov

209444260-lintnebd

Enclosure

**Christopher J. Drotzmann, OSB No. 962636**
E-mail: cdrotzmann@davisrothwell.com
**DAVIS ROTHWELL EARLE & XÓCHIHUA P.C.**
200 S.W. Market Street, Suite 1800
Portland, Oregon 97201
Tel:    (503) 222-4422
Fax:    (503) 222-4428

**Of Attorneys for Defendants**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON - PORTLAND DIVISION

STEVEN L. STANLEY,                                   Case No. 3:21-cv-193-MO

                        Plaintiff,          **DEFENDANTS' RESPONSE TO**
                                            **PLAINTIFF'S FIRST SET OF**
           v.                               **ADMISSIONS**

COMMUNITY DEVELOPMENT
PARTNERS (CDP) – ERIK PAINE; KYLE
PAINE, BRADFORD LONG; GUARDIAN
MANAGEMENT, LLC ,

                        Defendants.

Defendants answer plaintiff's First Set of Admissions as follows:

**REQUEST NO. 1:** Beginning on February 1, 2020 was the newly contracted company

(Guardian Management LLC) to take over and begin resident management of the property

known as Milepost 5/The Studios.

**ANSWER:** Object. This request does not request that defendants admit the truth of any

fact or the genuineness of any document. Subject to and without waiving that objection,

/ / /

Page 1   **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF**
         **ADMISSIONS**

L:\3500.0041-Stanley\PLD\RESP.RQA01.docx

defendants admit that Guardian Management, LLC became the property management company for Milepost 5 on February 1, 2020.

**REQUEST NO. 2:**  Was Guardian Mgmt. given the responsibility and or authority to implement policy, practices, rules, regulations, greivance [sic] procedures for the governance/operations within the MP5-Studios for residents guidance to follow as part of their residence-occupancy and written into or with as part of resident[s] lease agreement.

**ANSWER:**  Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that Guardian Management, LLC has authority to implement policies related to tenant grievances at Milepost 5.

**REQUEST NO. 3:**  In the Guardian lease agreement with residents upon admittance to residency into MP5/Studios is there an instructive no smoking policy or "Addendum" explaining such regulatory issue, i.e., restricted areas for no smoking, designated outdoor smoking area.

**ANSWER:**  Object This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that lease agreements at Milepost 5 include a No-Smoking Addendum designating the whole property as no-smoking.

**REQUEST NO. 4:**  If such policy (no smoking) exists whether encompassed, adopted into MP5 lease agreement[s] does MP5/Studios resident management in any way act to enforce this policy.

**ANSWER:**  Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving this objection, when a tenant is found to have violated the No-Smoking Addendum, regular practice is to issue a violation notice or to pursue a for-cause eviction against the perpetrator if the violations continue.

Page 2   **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF ADMISSIONS**

L:\3500.0041-Stanley\PLD\RESP.RQA01.docx

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.
200 SW MARKET ST, SUITE 1800
PORTLAND, OREGON  97201
T (503) 222-4422   F (503) 222-4428

**REQUEST NO. 5:** Is or does MP5/Studios and as a mixed-use commercial, resident, business and workplace facility taken measures and or are in compliance with the legislated "Oregons Clean Air Act" (ICAA) provisions governing such facilities.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that Milepost 5 is zoned as Commercial Mixed Use 2 and has taken measures to comply with Oregon's Clean Air Act.

**REQUEST NO. 6:** Did or did not Plaintiff provide notification to MP5 resident management on December 7, 2020 of a seriously MRSA infected resident giving the room number 240 and warning of a potential outbreak of MRSA as this resident was using community kitchens and bathrooms ungloved and unmasked.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that plaintiff sent a letter to management alleging that another tenant had contracted MRSA.

**REQUEST NO. 7:** Did MP5 resident management upon being informed of these highly contagious bacteria notify Oregon Health Authority and or County Health Dept. and to get proffesional [sic] medical guidance and instruction on how to deal with MRSA presence in the building and what special disenfectants [sic] and disinfecting methods to employ.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants are unaware of any MRSA presence at Milepost 5 and, therefore, were under no obligation to notify the Oregon Health Authority or county Health Department.

/ / /

/ / /

Page 3    **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF ADMISSIONS**

L:\3500.0041-Stanley\PLD\RESP.RQA01.docx

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.
200 SW MARKET ST, SUITE 1800
PORTLAND, OREGON 97201
T (503) 222-4422   F (503) 222-4428

**REQUEST NO. 8:** Did MP5 issue any flyer, email or other notification warning to/for residents to take extra precautionary measures in regard to residents who equally share common community use areas such as two kitchens and some dozen (12) plus bathrooms.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Plaintiff's request is too general for defendants to determine what fact or document plaintiff is referring to. Defendants will respond to a more specific request.

**REQUEST NO. 9:** Did MP5 resident management receive enumerable complaints, letters, memos, memoranda, phone voicemail regarding a range of violative issues such as egress violations, smoke and smoking in restricted areas, unlawful entries by non-residents, stowaway strangers 3-4 deep in a room for days at a time, greivance [sic] (due process) unconstitutionally violative issues to name but a few, notwithstanding harassment, deliberate acts of excessive noise and threats by tenants/occupants of Rooms 316, 215 and 214 through the time period of Sept – February 2020-2021.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. In addition, this request is compound as the request attempts to solicit an admission regarding multiple different tenants and multiple different complained of activities over a six-month period, which are distinct subject matters and require separate requests. Subject to and without waiving those objections, defendants admit that defendants received complaints from plaintiff regarding the tenants/occupants of Rooms 316, 215, and 214 during the time period of September 2020 through February 2021.

**REQUEST NO. 10:** Since Guardian assumed management of MP5/Studios on February 1, 2020 – Feb. 5, 2021 did/has MP5/Studios resident management and or Guardian central business office received complaints regarding disturbances of any kind/or nature by MP5/Studios residents by Any member of Homeowners Assoc and or residents of the

Page 4   **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF ADMISSIONS**

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.
200 SW MARKET ST, SUITE 1800
PORTLAND, OREGON 97201
T (503) 222-4422   F (503) 222-4428

L:\3500.0041-Stanley\PLD\RESP.RQA01.docx

Milepost 5/The Lofts residents whether by phone calls, emails, Guardian Management or

MP5/Studios web site address, text message, direct verbal face to face interactions with Any of

Guardian Managements MP5/Studios on-site management staff-employees of MP5/Studios. This

is to include letters.

ANSWER:  Object. This request does not request that defendants admit the truth of any

fact or the genuineness of any document. In addition, this request is compound as the request

attempts to solicit an admission regarding complaints from multiple parties regarding multiple

subject matters which requires separate requests. Subject to and without waiving those

objections, defendants admit that during the time period of February 1, 2020, to February 5,

2021, defendants received complaints from any member of Homeowners Association or

Milepost 5 residents regarding disturbance of any kind.

REQUEST NO. 11:  Likewise to Request 10 above, has MP5/Studios resident

management or Guardian Management central office received any complaints regarding

MP5/Studios residents regarding excessive noise, the conduct, behavior of MP5/Studios

residents, trash strewn about the MP5 property and or the upkeep of the MP5/Studios building

and surrounding property, whether via phone calls, text message communication, written letters,

emails, web site address[s] by Any of the neighborhood homeowners surrounding the

MP5/Studios complex.

ANSWER:  Object. This request does not request that defendants admit the truth of any

fact or the genuineness of any document. In addition, this request is compound as the request

attempts to solicit an admission regarding complaints from multiple parties regarding multiple

subject matters which requires separate requests. Subject to and without waiving those

objections, defendants admit that Guardian Management has received complaints of the kind

described in the request from any of the neighborhood homeowners surrounding the Milepost 5

complex.

Page 5  **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF**
**ADMISSIONS**

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.
200 SW Market St, Suite 1800
Portland, Oregon 97201
T (503) 222-4422   F (503) 222-4428

**REQUEST NO. 12:** Are and or were the security surveillance cameras installed at MP5/Studios active and functional on the late night and early morning hours of December 28, 29, 2020.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that security cameras are installed at Milepost 5 and were functional on December 28, 2020, and December 29, 2020.

**REQUEST NO. 13:** Is there a functional security camera surveillance device located and covering the front door lobby entrance of/to MP5/Studios.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that there is a functional security camera located at the front door lobby entrance of Milepost 5.

**REQUEST NO. 14:** Do the security surveillance cameras referenced above in Request No. 12 and 13 have an automatic eraser set at a specific time period of recorded video.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that the security cameras at Milepost 5 automatically erase data after a period of time.

**REQUEST NO. 15:** Did MP5/Studios Guardian management receive notification by Or. OSHA regarding non-compliance with the then Oregon Governors mandated restrictions (Covid-19) filed by Plaintiff with OR-OSHA in October, 2020.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection,

/ / /

**DAVIS ROTHWELL EARLE & XÓCHIHUA P.C.**
200 SW MARKET ST, SUITE 1800
PORTLAND, OREGON 97201
T (503) 222-4422   F (503) 222-4428

L:\3500.0041-Stanley\PLD\RESP.RQA01.docx

defendants admit that Guardian Management, LLC received notification from OR-OSHA of a complaint filed by plaintiff in October 2020.

**REQUEST NO. 16:** Did MP5/Studios Guardian management respond to OR-OSHA letter in regard to Plaintiffs' filed complaint and act on/in response to OR-OSHA letter request that the complained of conditions be corrected.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. In addition, plaintiff's request is compound and requires defendants to respond to requests regarding defendant's responses and its actions, which require separate requests. Subject to and without waiving those objections, defendants admit that Guardian Management, LLC responded to the notification from OR-OSHA described in Request No. 15.

**REQUEST NO. 17:** In response to Plaintiffs' many complaint[s] issues, with the exception of the OR-OSHA complaint cited above in Request No. 15 and 16 responded to by Kelly Paine, Guardian Management, Portfolio Manager's letter dated 12/17/2020 and "Complaint Response" dated 01/08/2021 in regard to Plaintiffs' report and complaint regarding the tenant/occupant of Room 328 at MP5/Studios brandishing a handgun and threatening to kill Plaintiff, …ever once respond to Plaintiff's complaints or otherwise acknowledge such written complaints with an inquiring response either with a written letter, phone call, text or email message and/or face to face discussion with Plaintiff regarding any of his [Plaintiff] complaints.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that Guardian Management, LLC responded to plaintiff's complaints regarding the tenant of Room 328 allegedly brandishing a handgun and threatening to kill plaintiff.

**REQUEST NO. 18:** At any time acting on Plaintiffs' report and complaint on the resident/occupant of MP5/Studios in Room 328 alleged "prompt" investigation of Rm. 328

Page 7   **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF ADMISSIONS**

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.
200 SW MARKET ST, SUITE 1800
PORTLAND, OREGON 97201
T (503) 222-4422   F (503) 222-4428

L:\3500.0041-Stanley\PLD\RESP.RQA01.docx

brandishing a hand gun at Plaintiff and threatening to kill Plaintiff ever call, actually interview Plaintiff to obtain further information and details regarding that event so as to garner further facts and circumstances of this incident prior to issuing their "Complaint Response" dated 01/08/2021 which occurred in the late night-early morning hours of December 28, 29, 2020.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants admit that Guardian Management, LLC interviewed plaintiff to obtain further information and details regarding the incident described in the request.

Not true

**REQUEST NO. 19:** On the morning of December 29, 2020 at approximately 9:46 am when Plaintiff was disposing of his garbage, did Guardian Management maintenance employee only known as "Doug" state to Plaintiff that he ["Doug"] would "serve a ten day notice served" on Plaintiff "tomorrow."

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, defendants deny that a Guardian Management, LLC employee named Doug stated to plaintiff that "Doug" would "serve a ten-day notice served" on plaintiff "tomorrow." Not true

**REQUEST NO. 20:** In regard to the event stated above in Request No. 19, did Guardian Management maintenance employee make the aforementioned alleged statement in the presence of and hearing distance of several surrounding MP5/Studios tenants.

**ANSWER:** Object. This request does not request that defendants admit the truth of any fact or the genuineness of any document. Subject to and without waiving that objection, after making a reasonable inquiry, the information known or readily obtainable by defendants is insufficient to enable defendants to admit or deny plaintiff's request.

/ / /

/ / /

Page 8  **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF ADMISSIONS**

**DAVIS ROTHWELL EARLE & XÓCHIHUA P.C.**
200 SW MARKET ST, SUITE 1800
PORTLAND, OREGON 97201
T (503) 222-4422   F (503) 222-4428

L:\3500.0041-Stanley\PLD\RESP.RQA01.docx

DATED this 18th day of March, 2021.

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.

*/s/ Christopher J. Drotzmann*

Christopher J. Drotzmann, OSB No. 962636
E-mail: cdrotzmann@davisrothwell.com
Of Attorneys for Defendants

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.
200 SW MARKET ST, SUITE 1800
PORTLAND, OREGON 97201
T (503) 222-4422   F (503) 222-4428