Carter M. Mann, OSB No. 960899
mannc@lanepowell.com
Courtney B. McFate, OSB 202025
mcfatec@lanepowell.com
**LANE POWELL PC**
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone:  503.778.2100
Facsimile:  503.778.2200

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STEVEN L. STANLEY,<br><br>                              Plaintiff,<br><br>    v.<br><br>COMMUNITY DEVELOPMENT PARTNERS (CDP); GUARDIAN MANAGEMENT, LLC; VIRIDIAN MANAGEMENT, INC.,<br><br>                              Defendants. | Case No. 3:21-CV-193-MO<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff STEVEN L. STANLEY ("Stanley" or "Plaintiff") alleges:

**PRELIMINARY STATEMENT**

1.     Plaintiff brings this action against defendants COMMUNITY DEVELOPMENT

PARTNERS (CDP), GUARDIAN MANAGEMENT, LLC, and VIRIDIAN MANAGEMENT,

INC. (collectively, "Defendants") for violations of the Fair Housing Amendments Act of 1988

("Fair Housing Amendments Act"), 42 U.S.C. § 3601 *et seq.*; violations of Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Rehabilitation Act"); violations of the Oregon

Fair Housing Act, O.R.S. 659A.145, *et seq.*; violations of the Oregon Residential Landlord and Tenant Act, O.R.S. 90.100, *et seq.*; negligence; and intentional infliction of emotional distress.

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the federal Fair Housing Amendments Act and the Rehabilitation Act.

3.     This court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

4.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of property that is the subject of the action is situated in this district.

## THE PARTIES

5.     Plaintiff is a 68-year-old disabled resident of Oregon.

6.     Since April 2019 and at all relevant times to this action, Plaintiff has resided as a tenant at the apartment complex owned, managed, and operated by Defendants and their agents and employees. This residential dwelling complex is located at 850 NE 81st Avenue in the city of Portland, in Multnomah County, and is commonly known and referred to as the Milepost 5 Apartments. (This property shall be referred to below as the "subject property".)

7.     Defendant COMMUNITY DEVELOPMENT PARTNERS ("CDP") is a California corporation and a business entity authorized to do business in Oregon, and is now, and at all times mentioned was, a real estate development business entity, and at all relevant times to this action, owned, managed, and/or operated the subject property.

8.     Defendant GUARDIAN MANAGEMENT, LLC ("Guardian") is an Oregon limited liability company that maintains offices and does business in Oregon. Guardian is a property management company hired by CDP to provide property management and operation services for the subject property, and has provided such services from February 1, 2021 to the present and continuing.

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

9.    Plaintiff is informed and based on that information believes that Defendant VIRIDIAN MANAGEMENT, INC. ("Viridian") is an Oregon corporation that maintains offices and does business in Oregon. Viridian was a property management company hired by CDP to provide property management and operation services for the subject property, and did provide such services until February 1, 2021.

10.    All of the Defendants named above shall be collectively known and referred to in this Complaint as the Defendants.

11.    Each of the Defendants was, at all times relevant to this action, the owner, agent, manager, employee, representing partner, member, officer, or joint venturer of the remaining Defendants and was acting within the course and scope of that relationship.

12.    Each of the Defendants gave consent to, ratified, and authorized the acts alleged as to each of the remaining Defendants.

## FACTS

### Plaintiff's Background and Tenancy

13.    Plaintiff is elderly and permanently disabled.

14.    Plaintiff is HIV positive and has Hepatitis C. He also suffers from Type 2 diabetes mellitus, chronic obstructive pulmonary disease (COPD), asthma, reactive airway disease, pulmonary hypertension, pulmonary nodules, period limb movement disorder, chronic maxillary sinusitis, Peyronie's disease, degenerative bilateral hip arthritis, peripheral neuropathy, and stage 3 hepatic fibrosis.

15.    Due to his disabilities, Plaintiff is unable to sustain employment, and has received Social Security Income since 2012.

16.    Plaintiff's disabilities substantially limit many of his major life activities, including but not limited to his ability to breathe and walk without assistance.

17.    Plaintiff has resided at the subject property from April 12, 2019 to the present.

18.    Plaintiff first learned about the subject property in March 2019 through his low-income housing manager, Makietha Gross.

PAGE 3 –  SECOND AMENDED COMPLAINT AND DEMAND FOR
        JURY TRIAL

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

19.     The subject property was advertised as an apartment building with studio-size units. It was also described as an artist community that included a full commercial kitchen, workspaces, and meeting facilities.

20.     At the time of his application for tenancy at the subject property in April 2019, Plaintiff notified Defendant Viridian (then the property manager of the subject property) that due to his disabilities, he would need a unit that had an accessible bathroom, which Defendants provided. As such, Defendants were on notice of Plaintiff's disabled status as of April 2019.

21.     Plaintiff signed a rental agreement with Defendant Viridian and moved into room 216 on April 12, 2019 ("rental agreement"). A true and correct copy of the rental agreement is attached hereto is **Exhibit A**.

22.     The rental agreement contains an attorneys' fees provision, stating in relevant part: "In the event Owner/Agent has to bring an action to enforce any provisions of this Rental Agreement or the Oregon Residential Landlord and Tenant Act, the prevailing party shall be entitled to, in addition to costs, reasonable attorneys' fees at trial and upon any appeal."

23.     The rental agreement also contains a no-smoking addendum, which states "the whole property is non-smoking".

24.     The rental agreement also contains a criminal activity addendum, which states "Resident[s] shall not engage in criminal activity…including illegal drug activity, on or near the Premises and shall not engage in any activity that constitutes a threat to people or property on or near the Premises."

25.     Throughout Plaintiff's tenancy and at all relevant times to this action, Defendants provided Plaintiff with unlawful and uninhabitable premises.

26.     Throughout the course of his tenancy at the subject property and at all relevant times to this action, Plaintiff complained about the problems he experienced at the subject property, but Defendants largely ignored Plaintiff's complaints.

27.     On December 20, 2019, and in response to Plaintiff's complaints, Plaintiff and Defendants CDP and Viridian entered into a Confidential Mutual Release and Settlement

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

Agreement ("Agreement"). Plaintiff released all claims that arose out of events up to and including December 20, 2019, but did not release claims related to future events. Defendant Guardian was not a party to this Agreement.

28.     Plaintiff is informed and based on that information believes that from the time he signed his lease for the subject property until February 1, 2021, the subject property was managed by Defendant Viridian.

29.     Plaintiff is informed and based on that information believes that since that date, the subject property has been managed by Defendant Guardian.

**Unsafe Conditions at the Subject Property**

30.     Beginning in or about September 2019, after several Viridian on-site personnel quit, the conditions at the subject property deteriorated rapidly. This deterioration included, but was not limited to: trash stacked several feet high in the community kitchen, a cockroach infestation in the community kitchen, spoiled food in the common areas, dirty and unhygienic bathrooms, and plumbing clogged with human waste. These conditions have continued from September 2019 to the present and have gotten worse over time.

31.     Also in or about September 2019, the building became extremely unsafe, with unauthorized visitors being let in off the street, and rampant drug use evidenced by the used syringes deposited in and around the subject property, including in the common area bathrooms and tenants' garden. The unauthorized visitors broke into tenants' rooms, stole tenants' food and belongings, and smoked tobacco, marijuana, methamphetamines, and crack cocaine throughout the building. These conditions have continued from September 2019 to the present and have gotten worse over time.

32.     As a result of the unsafe conditions at the subject property, and the failure of Defendants to abate those conditions, Plaintiff has feared and continues to fear for his personal safety.

33.     In addition, uninhabitable conditions at the property have prevented Plaintiff from safe egress and ingress. Specifically, there are bicycles, furniture, trash, and shopping carts stored

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

in the common hallways that block access to tenants' units. In addition, there is a single elevator in the building that is out of service for sometimes weeks at a time. Plaintiff has complained numerous times regarding these conditions, informing Defendants that he has disabilities that prevent him from navigating the hallways when they are in this condition; however, Defendants have done nothing to remedy these conditions. These conditions are continuing and have gotten worse over time.

34.     The current uninhabitable conditions and resulting inaccessibility greatly diminish Plaintiff's maneuverability, as well as his ability to access and enjoy his rental unit, as he suffers from degenerative bilateral hip arthritis and peripheral neuropathy that makes it difficult to move around the common areas.

**Plaintiff's Harassment by Other Tenants**

35.     Plaintiff also fears for his safety due to ongoing harassment from other tenants. Defendants are aware of this harassment and have done nothing to abate it.

36.     On or about December 28, 2020, Plaintiff was sitting at his window when a tenant from room 328 of the subject property threw a full unopened beer can at his window. Plaintiff complained of this incident to Defendant Viridian, who did not provide any assistance and did not address the issue.

37.     On or about December 29, 2020, the tenant in room 328, Jason Douglas Platt ("Platt"), stood below Plaintiff's windows yelling obscenities at him, including calling Plaintiff a "fucking faggot" and "queer". Plaintiff, who is openly gay, was deeply disturbed by these statements and feared for his personal safety.

38.     When Plaintiff went to confront Platt, he brandished a gun at Plaintiff and continued yelling verbal obscenities at Plaintiff, stating he would "shoot [Plaintiff] dead".  Plaintiff quickly went back to his apartment.

39.     Plaintiff complained of this incident to Defendant Viridian, who did not provide any assistance or abate the problem. Plaintiff, who feared for his safety, asked Defendant Viridian

PAGE 6 –  SECOND AMENDED COMPLAINT AND DEMAND FOR
JURY TRIAL

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

for Platt's name, which he did not have at the time, so Plaintiff he could file a temporary restraining order against him, but Defendant Viridian refused to provide that information.

40.     From October 2020 to approximately March 2021, Plaintiff received death threats and harassment from Platt and the tenant in room 316, including but not limited to threatening notes left on his front door. Upon information and belief, these death threats and harassment were retaliation for his complaints regarding the prior conduct of those tenants. He informed Defendants about the threats, but they did nothing to correct the problem or ensure Plaintiff's safety while at the subject property.

41.     As a result of the December 2020 incidents, and the resulting death threats and harassment, Plaintiff was granted a restraining order against Platt on March 9, 2021.

**Plaintiff's Medical Conditions Worsen Due to Conditions at the Subject Property**

42.     As stated above, Plaintiff's personal safety is at risk due to the uninhabitable and dangerous conditions at the subject property.

43.     In addition, plaintiff's medical conditions have worsened as a result of Defendants' failure to remedy the problems at the subject property.

44.     There is a no smoking policy in effect for all tenants at the subject property, which all tenants receive and sign at the time they sign their rental agreements.

45.     However, other tenants at the subject property have smoked and continue to smoke various legal and illegal substances freely inside the building, including but not limited to tobacco, marijuana, crack cocaine, heroin, and methamphetamines.

46.     As a result of the smoking of various legal and illegal substances at the subject property, Plaintiff's medical conditions, including but not limited to his sinusitis, asthma, and COPD have been exacerbated and have grown worse over time.

47.     Plaintiff has notified Defendants several times regarding these violations of the no smoking policy, informing Plaintiff of the effects of the smoke on his medical conditions, but Defendants have made no efforts to enforce this policy or address Plaintiff's concerns.

PAGE 7 –  SECOND AMENDED COMPLAINT AND DEMAND FOR
JURY TRIAL

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

48.     Plaintiff has also repeatedly asked Defendants to designate an area of the subject property as a no smoking area and relocate him to a unit in that area in order to mitigate the damaging effects; however, Defendants have refused to do so.

49.     Defendants' failure to enforce the no smoking policy, and failure to provide Plaintiff with the reasonable accommodations he has requested, have exacerbated Plaintiff's medical conditions, including his asthma, sinusitis, reactive airway disease, and COPD, greatly limiting his ability to breathe without assistance.

## FIRST CLAIM FOR RELIEF

### (Violations of the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 *et seq.*)

### (Against All Defendants)

50.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

51.     The Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.*, prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of…[] that person." (42 U.S.C. § 3604(f)(2)(A).)

52.     As stated in this Second Amended Complaint, Plaintiff is disabled and has several medical conditions that qualify as "handicaps" under the Fair Housing Amendments Act. (42 U.S.C. § 3604(h).)

53.     Defendants have engaged in the following discriminatory acts against Plaintiff: (a) refusing to maintain the habitability of the subject property, including but not limited to cleaning the subject property and keeping the common areas clear from debris, other tenants' belongings, spoiled food, and drug paraphernalia; (b) refusing to respond to and abate the unsafe conduct of other tenants at the subject property, including but not limited to increasing security measures and evicting unsafe tenants; (c) refusing to enforce the subject property's no smoking policy, leading to an exacerbation of Plaintiff's medical conditions, of which Defendants are aware; (d) refusing to keep the common areas clear of debris and other tenants' belongings, limiting Plaintiff's access

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

to his unit; (e) failing to engage in the interactive process with Plaintiff regarding his multiple requests for reasonable accommodation; and (f) failing to make reasonable accommodations in rules, policies, practices or services, including but not limited to designating a nonsmoking area of the subject property and relocating Plaintiff to a nonsmoking unit, when such an accommodation was necessary to afford Plaintiff an equal opportunity to use and enjoy the subject property.

54.     Defendants' discriminatory acts have resulted in denying Plaintiff equal privileges and access to the subject property as a disabled individual.

55.     In addition, Defendants' acts have unlawfully humiliated Plaintiff and interfered with his ability to exercise and enjoy rights granted and protected by the Fair Housing Amendments Act based on his disabled status.

56.     As a result of Defendants' conduct, Plaintiff has suffered damages including physical injury, emotional distress, anxiety, and stress.

57.     Defendants have acted with malice or reckless indifference that their actions might violate the Fair Housing Amendments Act, of which they were aware, and justify an award of punitive damages, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Violations of Section 504 of the Rehabilitation Act of 1973 – 29 U.S.C. § 794, *et seq.*)

### (Against Defendant CDP Only)

58.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

59.     Plaintiff is an individual with a disability pursuant to section 504 of the Rehabilitation Act.  (29 U.S.C. § 794.)

60.     Plaintiff is informed and based on that information believes that Defendant CDP is a recipient of federal financial assistance as defined under 29 U.S.C. § 794 and 24 C.F.R. §§ 8.2 and 8.3.

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

61.    As set forth in this Second Amended Complaint, Defendants have engaged in multiple acts subjecting Plaintiff to discrimination based on his disability. Defendants have also denied Plaintiff the benefits of his tenancy at the subject property based on his disability.

62.    As such, the actions of Defendant CDP constitute violations of section 504 of the Rehabilitation Act.

63.    As a result of Defendants' conduct, Plaintiff has suffered damages including physical injury, emotional distress, anxiety, and stress.

## THIRD CLAIM FOR RELIEF

### (Violations of the Oregon Fair Housing Act – O.R.S. §§ 659A.145, *et seq.*)

### (Against All Defendants)

64.    Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

65.    Plaintiff is an individual with a disability as defined under O.R.S. § 659A.104.

66.    As stated in this Second Amended Complaint, Defendants have engaged in conduct that has injured Plaintiff in violation of the Oregon Fair Housing Act.

67.    Specifically, Defendants have committed the following unlawful actions in violation of the Oregon Fair Housing Act: (a)  discriminating against Plaintiff in the provision of services in connection with housing because of Plaintiff's disability, including maintaining the habitability and accessibility of common areas; (c) failing to engage in the interactive process with Plaintiff regarding his requests for reasonable accommodation; (d) refusing to make reasonable accommodations in rules, policies, practices or services when the accommodations were and are necessary to afford Plaintiff with equal opportunity to use and enjoy his dwelling; (e) intimidating and interfering with Plaintiff's use and enjoyment of his home on account of Plaintiff's exercise of his rights under O.R.S. § 659A.145, in violation of O.R.S. § 659A.145(8);  and (f) assisting, inducing, inciting, or coercing others to violate O.R.S. § 659A.145, in violation of O.R.S. § 659A.145(7).

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

68.    As a result of Defendants' conduct, Plaintiff has suffered damages including physical injury, emotional distress, anxiety, and stress.

69.    The discriminatory actions of Defendants were intentional, willful, and taken in disregard for the rights of Plaintiff and Plaintiff is entitled to punitive damages pursuant to ORS 659A.885.

## FOURTH CLAIM FOR RELIEF

### (Violations of the Oregon Residential Landlord and Tenant Act – O.R.S. §§ 90.100, *et seq.*)

### (Against All Defendants)

70.    Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

71.    Under O.R.S. § 90.320, subsection (f), Defendants were required to maintain the subject property "safe for normal and reasonably foreseeable usages."

72.    Plaintiff notified Defendants of his disabilities and his inability to access, or leave, the premises if the common areas were full of debris, furniture, and other objects.

73.    Plaintiff also notified Defendants of the risk of injury to him, as an individual with degenerative bilateral hip arthritis and peripheral neuropathy, if the common areas were not clear and maintained.

74.    Plaintiff also notified Defendants of his asthma, COPD, reactive airway disease, and chronic maxillary sinusitis, and the exacerbation of those conditions resulting from Defendants' failure to enforce their own no smoking policy at the subject property.

75.    Plaintiff also notified Defendants of the spoiled food, drug paraphernalia, trash, and clogged toilets resulting from Defendants' failure to maintain the habitability of the subject property.

76.    Plaintiff also notified Defendants of the death threats, assault, and harassing behavior towards him by other tenants.

PAGE 11 –SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

77.     Despite Defendants' full awareness of the above conditions, Defendants have failed to maintain the subject property safe for normal and reasonably foreseeable usages – specifically, Plaintiff's use of his own apartment and the common areas.

78.     Also, as stated in this Second Amended Complaint, Defendants have discriminated against Plaintiff in violation of state and federal laws, in violation of O.R.S. § 90.390.

79.     Plaintiff has suffered severe and profound tangible consequences as a result of Defendants' conduct, including but not limited to exacerbations of his medical conditions.

## FIFTH CLAIM FOR RELIEF

### (Negligence)

### (Against All Defendants)

80.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

81.     When Defendants rented room 216 of the subject property to Plaintiff for residential use, Defendants undertook a responsibility and a duty to use reasonable care in accordance with industry standards and Oregon state law, codes, and regulations in inspecting, maintaining and remediating the common areas and dwelling units.

82.     As alleged in this Second Amended Complaint, Defendants have breached that duty of care by failing to appropriately abate the unhygienic conditions, maintenance issues, and safety issues described herein.

83.     Defendants knew or should have known that failure to use reasonable care in inspecting, maintaining, and remediating building conditions would cause serious economic and non-economic impacts to Plaintiff, including severe health impacts.

84.     Defendants' breach of care was in violation of federal, state, and local codes and regulations, and caused foreseeable and unreasonable risk of economic loss as well as risk of serious medical impacts as alleged in this complaint.

PAGE 12 – SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

## SIXTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

### (Against All Defendants)

85.      Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

86.      Defendants are liable to Plaintiff for intentional infliction of emotional distress, in that Defendants intended to inflict severe emotional distress on Plaintiff, or knew that such distress was certain, or substantially certain, to result from their conduct.

87.      Defendants' acts constitute an extraordinary transgression of the bounds of socially tolerable conduct.

88.      As stated in this Second Amended Complaint, Defendants have allowed the subject property to deteriorate into a filthy and unsafe place where drug use is rampant and debris is found throughout the common areas.

89.      Defendants' conduct caused the Plaintiff severe emotional distress, including stress and anxiety, as he fears for his personal safety when at his own apartment, and his serious medical conditions have been exacerbated by the conditions at the subject property.

90.      As a result of the Defendants' unlawful actions, Plaintiff has endured such frustration, mental anguish, humiliation, and embarrassment as is concomitant with being treated as a "second class citizen."

91.      Defendants' conduct was committed with malice, or, in the alternative, with such a degree of reckless indifference to the welfare of others to also warrant the impositions of punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

A.      On the First Claim for Relief, Plaintiff prays for a declaration that the discriminatory practices of Defendants, as set forth and alleged herein, were in violation of the

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

federal Fair Housing Amendments Act of 1988, and further prays for compensatory damages, punitive damages, and attorneys' fees and costs;

B.    On the Second Claim for Relief, Plaintiff prays for a declaration that the discriminatory practices of Defendants, as set forth and alleged herein, were in violation of Section 504 of the Rehabilitation Act of 1973, and further prays for compensatory damages in an amount to be determined at trial, and attorneys' fees and costs;

C.    On the Third Claim for Relief, Plaintiff prays for a declaration that the discriminatory practices of Defendants, as set forth and alleged herein, were in violation of the Oregon Fair Housing Act, and further prays for compensatory damages and punitive damages in an amount to be determined at trial, and attorneys' fees and costs;

D.    On the Fourth Claim for Relief, Plaintiff prays for compensatory damages in an amount to be determined at trial, and attorneys' fees and costs;

E.    On the Fifth Claim for Relief, Plaintiff prays for compensatory damages in an amount to be determined at trial, and attorneys' fees and costs;

F.    On the Sixth Claim for Relief, Plaintiff prays for compensatory and punitive damages in an amount to be determined at trial, and attorneys' fees and costs;

G.    Pre- and post-judgment interest; and

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719694.0001/8526129.3

H.      For such other and further relief in law or equity as the Court may deem just and

proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues properly triable before a jury.


DATED:  August 12, 2021

                             LANE POWELL PC


                             By:    *s/ Courtney B. McFate*
                                     Carter M. Mann, OSB No. 960899
                                     Courtney B. McFate, OSB No. 202025
                                     Telephone:  503.778.2100
                             Attorneys for Plaintiff

EXIBIT #H

## OREGON
## RENTAL AGREEMENT

MULTIFAMILY NW
The Association Promoting Quality Rental Housing

| ☑ MOVE-IN | ☐ RENEWAL | ☐ TRANSFER | ☐ FILE CHANGES | ORIGINAL MOVE-IN DATE 4/12/2019 | ☐ Section 8 Housing Choice Voucher | ☐ Check if there are one or more co-signer agreements related to this Rental Agreement. Failure to check the box does not invalidate any co-signer agreements |

**PARTIES**

DATE 4/12/2019    PROPERTY NAME / NUMBER

RESIDENTS: (NAME ALL ADULTS) Steven L Stanley

(COLLECTIVELY "RESIDENT")

PREMISES ADDRESS 850 NE 81st Ave    UNIT # 216    CITY Portland    STATE OR    ZIP 97213

EMAIL/PHONE NUMBER/OTHER METHOD FOR ELECTRONIC DELIVERY OF ACTUAL NOTICES AND UTILITY BILLS:
EMAIL    MOBILE PHONE 503 957 4226    OTHER ELECTRONIC METHOD text on phone

OWNER/AGENT Viridian Management    OWNER/AGENT EMAIL Serge Sinclentsev @viridianmgt.com

MAILING ADDRESS 850 NE 81st Ave Suite 104    CITY Portland    STATE OR    ZIP 97213

OWNER/AGENT'S DESIGNATED LOCATION FOR ATTACHED NOTICES:
850 NE 81st Ave
(INCLUDE STREET ADDRESS OR LOCATION AND DESCRIPTION OF WHERE TO POST, SUCH AS "FRONT DOOR OF OFFICE," "FRONT DOOR OF CLUBHOUSE," "UNIT # OF OFFICE," ETC.)

**TENANCY**

☑ LEASE TERM BEGINNING:    AND ENDING:    ☐ CHECK IF EARLY TERMINATION PROVISION APPLIES (SEE LEASE BREAK FEE BELOW)

MONTHLY STATED RENT INCREASE ON CONVERSION TO MONTH-TO-MONTH TENANCY (SEE TERMS AND CONDITIONS SECTION 8 FOR DETAILS):
AMOUNT OF INCREASE: $    ($300.00 IF LEFT BLANK) NEW MONTHLY STATED RENT: $    EFFECTIVE DATE:    (DAY AFTER TERM ENDING DATE)

☑ MONTH-TO-MONTH BEGINNING: 4/12/2019    RENT DUE DATE (IF OTHER THAN FIRST):

**MONTHLY CHARGES / FEES**

| MONTHLY STATED RENT | $ 805 | LEASE BREAK FEE (1½ TIMES MONTHLY STATED RENT IF BLANK) (NOT TO EXCEED 1½ TIMES MONTHLY STATED RENT) | $ 1/½ |
| OTHER | $ | DISHONORED CHECK FEE | $35 + BANK CHARGES |
| OTHER | $ | SMOKE ALARM/CARBON MONOXIDE ALARM TAMPERING FEE (NOT TO EXCEED $250) ($250 IF BLANK) | $ 250 |
| OTHER | $ | HOA MOVE-IN FEE (THIS IS THE CURRENT AMOUNT. ACTUAL AMOUNT WILL CHANGE IF HOA CHANGES FEE) | $ 0 |
| OTHER | $ | HOA MOVE-OUT FEE (THIS IS THE CURRENT AMOUNT ACTUAL AMOUNT WILL CHANGE IF HOA CHANGES FEE) | $ 0 |
| OTHER | $ | LATE RENT PAYMENT FEE: (CHOOSE ONE) ☑ FLAT AMOUNT OF | $ 50 |
| TOTAL MONTHLY CHARGES | $ 805 | LATE FEE BECOMES DUE AND PAYABLE WHEN RENT IS NOT RECEIVED BY THE END OF THE 4TH DAY OF THE RENTAL PERIOD. ☐ PER DAY @ | $ |
| TOTAL DEPOSITS CHARGED | $ 805 | ☐ 5% OF STATED RENT EVERY 5 DAYS WHICH IS | $ |

**DEPOSITS**

| DEPOSITS PAID | $ 0 |
| BALANCE OF DEPOSITS DUE | $ 805 |
SEE INSTALLMENT PAYMENT AGREEMENT OR SPECIAL PROVISIONS IF BALANCE DUE.
☐ IF CHECKED, DEPOSITS WILL BE HELD BY OWNER

PRO-RATE METHOD: ☐ A ☐ B ☐ C (SEE #1 ON PAGE 2)
☐ IF CHECKED, SEE MOVE-IN ACCOUNTING (FORM # M004 OR)
☐ IF CHECKED, SEE SECOND MONTH'S ACCOUNTING FOR ADDITIONAL CHARGES/ADJUSTMENTS (FORM # M035)

**PROVISIONS / DISCLOSURES**

SPECIAL PROVISIONS AND/OR DISCLOSURES:
Door Code: #2014
Garbage Code: 2014
Mail Box 34

**OTHER OCCUPANTS**

| NAME | DATE OF BIRTH |
| | |

**VEHICLES**

| MAKE | MODEL | COLOR | STATE | LICENSE PLATE # |
| | | | | |

PAGE 1 OF

**ALARMS**

**SMOKE ALARMS & CARBON MONOXIDE ALARMS:** Resident acknowledges and Owner/Agent certifies that the unit is equipped with a smoke alarm and, if required, a carbon monoxide alarm and that the smoke alarm and the carbon monoxide alarm have been tested and are operable at this time. It is Resident's responsibility to test the smoke alarm and carbon monoxide alarm at least every six (6) months, replace dead batteries as required, and notify Owner/Agent in writing of any operating deficiencies. Resident shall not remove or tamper with a functioning smoke alarm or carbon monoxide alarm, including removing working batteries, and Owner/Agent may charge a fee of up to $250.00 for any such conduct.

TYPE OF SMOKE ALARM: ☐ BATTERY  ☐ ELECTRIC  ☑ ELECTRIC WITH BATTERY BACKUP

TYPE OF CARBON MONOXIDE ALARM: ☐ BATTERY  ☐ ELECTRIC  ☑ ELECTRIC WITH BATTERY BACKUP

*I have received instructions on the proper use of the smoke alarm and carbon monoxide alarm, if applicable.*

**UTILITIES**

| PAID FOR / PROVIDED BY: | ELECTRICITY | WATER | SEWER | GARBAGE SERVICE | GARBAGE CONTAINER | BASIC CABLE | N/A GAS | PUBL SERVICE CHRGS | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| OWNER | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ | ☐ | ☐ |
| RESIDENT | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

THE FOLLOWING UTILITIES OR SERVICES PAID FOR BY RESIDENT WILL BENEFIT OTHER RESIDENTS OR OWNER/AGENT: \_\_\_\_ SERVICE CHARGE FOR CABLE / INTERNET / ETC. ($ or %): \_\_\_\_

ANY YARD INCLUDED IN THE LEASED PREMISES WILL BE MAINTAINED BY: ☐ RESIDENT  ☑ OWNER/AGENT
(SEE SECTION 17 OF THE TERMS AND CONDITIONS BELOW FOR OWNER/AGENT ENTRY RIGHTS)

☐ IF CHECKED, SEE UTILITY BILL-BACK ADDENDUM (FORM # M047)

**OTHER**

☑ IF CHECKED, PETS ARE NOT ALLOWED AT THIS PROPERTY

☐ IF CHECKED, THE FOLLOWING PETS ARE APPROVED BY OWNER/AGENT—NUMBER & TYPE: \_\_\_\_

☐ IF CHECKED, RENTER'S INSURANCE IS REQUIRED*  MINIMUM INSURANCE AMOUNT $ \_\_\_\_ ($100,000 IF LEFT BLANK)
*(SEE STATUTORY EXCEPTIONS LISTED IN SECTION 21)
INSURANCE COMPANY NAME \_\_\_\_ POLICY # \_\_\_\_

SMOKING POLICY: ☐ SMOKING ALLOWED—ENTIRE PREMISES  ☑ SMOKING PROHIBITED—ENTIRE PREMISES
☐ SMOKING ALLOWED IN LIMITED AREAS (SEE SMOKING POLICY ADDENDUM)    34

THE DWELLING UNIT IS LOCATED WITHIN A 100-YEAR FLOODPLAIN: ☐ YES ☐ NO.    MAILBOX: \_\_\_\_

**I / WE HAVE READ AND AGREE TO THE TERMS AND CONDITIONS LISTED ON ALL PAGES OF THIS AGREEMENT.**

| RESIDENT X *Steven L. Stanley* | DATE *4/12/19* | RESIDENT X | DATE |
|---|---|---|---|
| RESIDENT X | DATE | RESIDENT X | DATE |
| RESIDENT X | DATE | RESIDENT X | DATE |

PERSON TO CONTACT IN THE EVENT OF AN EMERGENCY X *Charles E. Dike Cousin (cousin)*  PHONE *503-528-4020*

ADDRESS, CITY, STATE, ZIP *5756 SE Preston Court, Hillsboro, Or. 97129*

PERSON TO CONTACT IN THE EVENT OF MY DEATH *John R. Stanley (Brother)*  PHONE *714-610-0158*

ADDRESS, CITY, STATE, ZIP *525 E. Gurley St. #1B, Prescott, Arizona 86301*

OWNER/AGENT X \_\_\_\_  DATE *11/7/2019*  IF APPLICABLE, REAL ESTATE BROKER APPROVAL

REAL ESTATE LICENSEE NAME & ADDRESS  INITIAL XX  DATE XX

## TERMS AND CONDITIONS

**1. RENTS:** Unless another date is set forth above, all monthly charges are due and payable on the first of the month and must be paid on time. If rent is not paid by the end of the 4th day of the rental period a late fee in the amount stated on this Rental Agreement will be imposed and become due on the 5th day of the rental period and Owner/Agent may require the rent payment and late fee to be paid by certified check or money order. Partial payments will not be accepted without prior Owner/Agent approval. To protect Owner and its Agents, Owner/Agent may refuse to accept cash payments, rent payments from anyone other than Resident or multiple checks for rent. If any check from Resident has been dishonored for any reason, Owner/Agent may require Resident to make all future rent payments by certified check or money order. If the tenancy is a month-to-month tenancy, Owner/Agent may not increase rents during the first year after the tenancy begins, and may increase rents at any time after the first year of the tenancy by giving Resident at least 90 days prior written notice of the effective date of the rent increase. The notice will specify the amount of the rent increase, the amount of the new rent and the date on which the increase becomes effective. The daily prorates of rents and other monthly charges will be based on one of the following methods chosen by Owner/Agent,

which method will be consistently applied throughout the rental term: a) a 360-day year composed of twelve months of 30 days each; b) a 365-day year; or c) the actual number of days in the current month. The daily amount will be multiplied by the actual number of days of occupancy in the current month. NOTE: Unless otherwise specified, the pro-rate shall be based on a 365-day year.

**2. NONPAYMENT OF RENT OR OTHER AMOUNTS DUE:** If rent is not paid when due, Owner/Agent may issue a 144-hour notice of nonpayment of rent on or after the 5th day of the rental period or a 72-hour notice of nonpayment of rent on or after the 8th day of the rental period. Failure of Resident to timely pay any other amounts due Owner/Agent is a material noncompliance with this Rental Agreement.

**3. APPLICATION OF PAYMENTS:** Except as set forth below, all payments made by Resident to Owner/Agent after the tenancy commences, no matter how designated by Resident, may be applied by Owner/Agent as follows: first to any outstanding rent from prior periods; second, rent for the current rental period; third, utility or service charges; fourth, to late rent payment charges; and finally, to any other fees, charges, damage claims or other claims owed by Resident. Owner/Agent may not deduct a previously imposed late charge from a current or subsequent rental period rent payment, thereby making that rent

payment delinquent for imposition of a new or additional late charge or for termination of the tenancy for nonpayment of rent. Owner/Agent may not deduct a noncompliance fee from a rent payment.

**4. EARLY TERMINATION OF LEASE:** If the early termination box is checked on page 1 of this Rental Agreement, upon any failure of Resident to occupy the unit for the full term, for any reason other than as provided in ORS 90.453(2), 90.472 or 90.475, Owner/Agent may charge Resident, all of the following: a) all rent, unpaid fees and other non-rent charges accrued prior to the date that Owner/Agent knew or reasonably should have known of the abandonment or relinquishment of the unit; b) all damages relating to the condition of the unit; c) an early termination fee in the amount set forth on the front of this Rental Agreement, which amount may not exceed one and one-half month's stated rent; and d) interest on the above amounts at the statutory rate from the date each was due. The early termination fee is due on the earlier of the date Resident gives notice to vacate or the date the unit is vacated. All other amounts are due at the times specified in this Rental Agreement. If the early termination box is not checked, or if Resident has not given Owner/Agent at least 30 days written notice of intent to terminate and paid rent through the termination date, Owner/Agent may recover from Resident, instead of the above amounts, all actual

Form M001 OR Copyright © 2017 Multifamily NW™ NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION. Revised 10/02/2017.

Exhibit A, pg. 2 of 16

damages resulting from the early termination, including but not limited to: repayment of concessions; all rent through the earlier of the date the unit is re-rented and the lease termination date; advertising and administrative costs to re-rent the unit; concessions given to re-rent the unit; the difference in rent if a lower rental rate is received from a replacement resident during the remaining term of the original Rental Agreement; damages related to the condition of the unit, and interest on all amounts at the statutory rate.

**5. TERMINATION OF MONTH-TO-MONTH TENANCY:** A 30-day written notice to terminate will be required for Resident to terminate a month-to-month tenancy. Any termination notice from Resident may not be revoked without Owner/Agent's written consent Owner/Agent must give at least 30' days' written notice to terminate a month-to-month tenancy during the first year of the occupancy. Except as otherwise provided by law, after the first year of occupancy at least 60' days' written notice will be required. First year of the occupancy includes all periods in which any of the Residents has resided in the unit for one year or less. If Resident fails to vacate at the end of any termination notice, Resident will be liable for Owner/Agent's actual damages.

'In certain local jurisdictions, the minimum notice period for Owner/Agent to terminate using an end of tenancy notice is longer.

**6. CONVERSION OF FIXED-TERM TENANCY:** A fixed-term tenancy will automatically convert to a month-to-month tenancy unless the parties agree on a new fixed term prior to the end of the existing fixed term or either party has properly terminated the tenancy by giving at least 30' days' written notice prior to the end of the fixed term, or 60' days by the Owner/Agent if such termination is after the first year of occupancy. Unless Owner/Agent has provided a written rent increase notice with a different amount, effective automatically upon conversion to a month-to-month tenancy, the Monthly Stated Rent will increase by the amount set forth on page one of this Agreement.

'In certain local jurisdictions, the minimum notice period for Owner/Agent to terminate using an end of tenancy notice is longer.

**7. PETS, WATERBEDS AND MUSICAL INSTRUMENTS:** No cats, dogs or other pets capable of causing damage to persons or property are allowed on the Premises (either visiting or living there) without a signed pet agreement, payment of any deposit, and providing insurance, as required by Owner/Agent. Resident will be responsible for and indemnity Owner/Agent against any and all damage or injuries caused by his/her or visiting pet(s). Waterbeds and/or aquariums are permissible only with proper insurance and written approval by Owner/Agent. Musical instruments are not allowed without the prior written consent of Owner/Agent.

**8. OCCUPANTS:** The unit will be used only for housing persons listed on this Rental Agreement. Additional Residents must be approved by Owner/Agent and are subject to full screening procedures. Persons other than those specifically listed on this Rental Agreement shall be strictly prohibited from staying in the rental unit for more than 10 consecutive days, or a total of 20 days in any 12-month period. For purposes of this section, "staying in the rental unit" means presence on the Premises for a substantial amount of time, whether during the day or overnight, and shall include, but not be limited to, long-term or regular house guests, live-in baby-sitters, visiting relatives, etc. Resident shall notify Owner/Agent in writing at the earlier of: any time the Resident expects any guest to be staying in excess of the time limits contained in this paragraph; or when such person in fact stays in excess of such time limits. Subdivided Residents shall be required to submit a report to the Owner/Agent identifying any person not identified on this Rental Agreement and staying in the rental unit for more than 10 consecutive days, or 20 nonconsecutive days in any 12-month period, and shall state whether such person is contributing to the income of Resident and to what extent. Owner/Agent may require any person listed on page 1 as an "Other Occupant," upon reaching the age of 18, to submit an application and screening charge to Owner/Agent, be screened and if the person meets all current screening criteria, be added to this Rental Agreement as a Resident. Failure to submit an application and screening charge within 10 days of Owner/Agent's request, failure to meet the screening criteria, or failure to execute documents to be added as a Resident within 10 days of a successful screening, will be a material violation of this Rental Agreement.

**9. SUBLETTING:** Transfer of any interest in this Rental Agreement or subletting the Premises, or any part, is not permitted without Owner/Agent written approval. Subletting means allowing anyone to stay in your unit for consideration, including but not limited to nightly or short-term rentals.

**10. CARE OF PREMISES:** Resident agrees to keep all areas of the Premises clean, sanitary and free from any accumulations of debris, filth, rubbish and garbage and to dispose of same in a proper manner. Resident shall take particular caution regarding the use of cigarettes and other, fire hazards. Resident shall not store flammable or hazardous materials. Resident will not store personal property in a manner or in amounts which: increase the risk of fire; impedes proper air circulation; promotes mold growth; impedes safe ingress and egress; overloads floors; encourages pest infestations; or otherwise creates the potential for damage to the unit or danger for Resident or neighbors living on the Premises. Resident is responsible for all damages to furnishings or Premises caused by his/her negligence, or beyond normal wear and tear. Damage from any type of smoke will never be considered normal wear and tear. Resident shall report leaky or defective faucets at once. Resident must pay for any and all expense due to damage to the building or furnishings, other than ordinary wear and tear, including but not limited to damage caused by stoppage of waste pipes or overflows of bathtubs, toilets or wash basins. Resident is responsible for replacing lightbulbs and batteries which need replacement during the tenancy.

**11. BARBECUES/FIRE PITS:** Resident must fully comply with all applicable codes and regulations related to the use of barbecues. In many areas, fire codes prohibit the use of either charcoal or propane barbecues on apartment balconies or porches unless the area is protected by a fire sprinkler system or all adjacent building surfaces are totally non-combustible. The only exception is the use of electric-style barbecues or the small hibachi-style barbecues that utilize one-pound propane cylinders. These may be allowed when kept well away from combustible building surfaces and unplugged or with cylinder removed (as applicable) when not in use. Fire pits are prohibited.

**⑫ 12. USE OF AND CHANGES TO PREMISES:** Resident will: (a) use all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances on the Premises in a reasonable manner; (b) immediately obtain, pay for and not allow to be disconnected or discontinued the utilities which Resident is responsible; (c) make no changes or additions to the Premises of any nature; (d) not install or attach anything on the walls, ceilings or in the windows that will cause damage to the unit without the prior written consent of Owner/Agent; (e) not hang anything on or tamper with any fire safety system; (f) not engage in any conduct that violates any applicable laws: (g) not remove, obstruct or tamper with a sprinkler head used for fire suppression. Satellite dishes and/or antennas will be allowed only in strict compliance with Owner/Agent's satellite dish policy and applicable law.

**⑬ 13. DAMAGE:** Resident agrees not to destroy, damage, deface or remove any part of the Premises or permit any persons to do so and to assume all liability for damages other than ordinary wear and tear.

**14. SECURITY DEPOSITS:** All refundable deposits, however designated, may be used by Owner/Agent to offset any damage, unusual wear and tear or unpaid accounts (including rent) either during the tenancy or at the time of move-out. Owner/Agent may deduct the cost of carpet cleaning from the deposit regardless of whether Resident cleans the carpet before delivering possession of the dwelling unit back to Owner/Agent. A portion of the deposit is used during the tenancy. Resident will replenish it upon demand. If applied at move-out, any excess will be refunded within the time and in the manner required by law. Any deficiency will be due from Resident at the time the accounting is sent to Resident. Any amounts not paid by Resident within 31 days of the due date will incur interest at 1% per month. Sending the accounting and/or refunding any deposit does not waive the Owner/Agent's right to payment for charges discovered or finalized after the accounting was sent. Any security deposit received from multiple Residents shall be refunded: (a) only when the last Resident vacates the unit and terminates his/her tenancy; (b) made payable to all Residents, unless agreed otherwise by all Residents and Owner/Agent in writing; and (c) mailed to any single forwarding address supplied by Resident (if no

forwarding address is supplied, it will be mailed to Premises). Other than a security deposit final accounting which must be delivered as required by law, Resident authorizes Owner/Agent to send communications about past due amounts to any email, mobile phone or other electronic method listed on the front of this Rental Agreement. Security deposits may be deposited into an interest-bearing account. All interest shall accrue to the benefit of Owner/Agent pursuant to any agreement between Owner and Agent. No interest will be paid to Resident on security deposits. If the "Deposits Held By Owner" box is checked on page 1 of this Rental Agreement, all deposits will be deposited by Agent into a trust account as required by Oregon law. Agent will then forward the deposits to the Owner of the property, who will manage the deposits pursuant to Oregon law.

**15. NON-COMPLIANCE FEES:** Owner/Agent may charge a fee for a second noncompliance or for a subsequent noncompliance with written rules or policies that describe the prohibited conduct and the fee for a second noncompliance, and for any third or subsequent noncompliance, that occurs within one year after a written warning notice. Except as provided below, the fee may not exceed $50 for the second noncompliance within one year after the warning notice for the same or a similar noncompliance or $50 plus five percent of the rent payment for the current rental period for a third or subsequent noncompliance within one year after the warning notice for the same or a similar noncompliance. Owner/Agent may charge a fee for occurrences of noncompliance with written rules or policies for the following types of noncompliance: (A) The late payment of a utility or service charge that the tenant owes the landlord (date of payment must be specified in the utility bill and must not be less than 30 days after delivery of the bill); (B) Failure to clean up pet waste from a part of the Premises other than the dwelling unit; (C) Failure to clean up the waste of a service animal or a companion animal from a part of the Premises other than the dwelling unit; (D) Failure to clean up garbage, rubbish and other waste from a part of the Premises other than the dwelling unit; (E) Parking violations; (F) The improper use of vehicles within the Premises; (G) Smoking in a clearly designated nonsmoking unit or area of the Premises; and (H) Keeping on the Premises an unauthorized pet capable of causing damage to persons or property. The fee for a second or subsequent noncompliance with subsections (G) or (H) may not exceed $250 and cannot be assessed before 24 hours for subsection (G) and 48 hours for subsection (H) after the required warning to Resident.

**16. JOINT RESPONSIBILITY:** Each Resident is jointly and severally responsible for rent, all other performance and financial obligations hereunder and any damage caused to the dwelling unit or common area by Resident, any Resident or Occupant of the same unit or his/her guests. Cost of repairs for damage must be paid within 30 days after receiving a bill unless other arrangements have been made, in writing, with Owner/Agent. Any valid termination notice received from any one Resident may be considered by Owner/Agent a termination notice from all Residents. Any Resident not giving the notice who desires to remain in the Premises may be required to submit updated financial information and requalify under Owner/Agent's then-current criteria.

**⑰ 17. ACCESS:** Resident agrees not to unreasonably withhold consent to Owner/Agent to enter the unit in order to inspect the Premises (including taking pictures to document the condition of the Premises), make necessary or agreed repairs, decorations, alterations, or improvements or to show the unit to prospective buyers or residents. Owner/Agent may enter the unit without consent in an emergency or at any reasonable time with 24 hours' actual notice or after receipt of Resident's written request for maintenance. If Owner/Agent is obligated to maintain the yard, Owner/Agent, or its contractors, may enter the yard (but not the dwelling unit) without notice, at reasonable times and with reasonable frequency, to perform the maintenance.

**18. ABSENCE:** Resident agrees to notify Owner/Agent of any absence in excess of seven (7) days no later than the first day of absence.

**19. LEGAL ACTION:** In the event Owner/Agent has to bring an action to enforce any provisions of this Rental Agreement or the Oregon Residential Landlord and Tenant Act, the prevailing party shall be entitled to, in addition to costs, reasonable attorney's fees at trial and upon any appeal.

PAGE 3 OF 4 • RENTAL AGREEMENT

From M001 OR Copyright ... 2017 Multifamily NW  NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION. Revised 10/20/2017.

Exhibit A, pg. 3 of 16

**20. LOCKS:** Doors of Resident's unit should be kept locked. Resident shall notify Owner/Agent in writing if locks fail to operate. Owner/Agent will not be liable or responsible in any way for loss or damage to articles or property belonging to Resident. Resident shall not change the locks without Owner/Agent's prior consent. Resident shall immediately provide Owner/Agent with a key to any new locks installed. Owner/Agent is not required to provide lockout services.

**21. RENTER'S INSURANCE:** If renter's insurance is required by this Rental Agreement, the Resident, or all Residents if there are multiple Residents, will obtain and maintain insurance with liability coverages of at least the minimum amount listed. If there are multiple Residents, all must be named insureds on the policy, or at the Residents' option, they may each obtain a policy with limits in the minimum amount listed. Oregon law provides that no insurance may be required if: a) the household income of all of the Residents in the Unit is equal to or less than 50 percent of the area median income, adjusted for family size as measured up to a five-person family; or b) if the dwelling unit has been subsidized with public funds, not including housing choice vouchers. Resident will supply Owner/Agent with evidence of renter's insurance prior to occupying the unit. Resident must name Owner/Agent as an interested party on Resident's renter's liability insurance policy authorizing the insurer to notify Owner/Agent of: (A) cancellation or nonrenewal of the policy; (B) reduction of policy coverage; or (C) removal of Owner/Agent as an interested party. Owner/Agent may require documentation that: (a) Resident has named Owner/Agent as an interested party on Resident's renter's liability insurance policy; or (b) that Resident's liability insurance is in effect on a periodic basis related to the coverage period of the renter's liability insurance policy or more frequently if Owner/Agent reasonably believes that Resident fails to maintain the renter's liability insurance. Failure to maintain such insurance in full force will be considered a material non-compliance with this Rental Agreement. Owner/Agent may require that Resident obtain or maintain renter's liability insurance only if Owner/Agent obtains and maintains comparable liability insurance and provides documentation to any Resident who requests the documentation, orally or in writing. Owner/Agent may provide documentation to Resident in person, by mail or by posting in a common area or office. The documentation may consist of a current certificate of coverage, if insurance is not required by this Rental Agreement. Resident should maintain renter's insurance to cover Resident's liability to Owner/Agent, as well as damage or destruction of Resident's property. Whether or not renter's insurance is required, Resident is not a co-insured under, and has no rights to, Owner/Agent's insurance policies. Except to the extent required by law, Owner/Agent is not responsible for, and its insurance does not cover damage or destruction to, Resident's property.

**22. CONDUCT:** The dwelling unit is to be used only as a dwelling. The dwelling unit may not be used for the conduct of any commercial activity that involves customers or clients coming to the unit (including but not limited to day care) or the delivery or storage of inventory or equipment. Each Resident is responsible for his/her own conduct, as well as that of the other Residents in the unit and their guests. Noisy or other conduct that disturbs the quiet enjoyment of any other resident or drunk or disorderly conduct will not be permitted at any time. Between 10:00 p.m. and 7:00 a.m. the level and/or type of noise emitted from the unit may not exceed what is normal and customary for similar housing. Residents will not be permitted to play in halls, stairways or entrance of buildings, gardens or landscape areas except where specifically permitted by Owner/Agent. The use, possession, manufacture, or distribution of illegal substances, as defined in either federal or state law, either on or in the vicinity of the Premises is strictly prohibited. Resident may not allow any person to: a) be on the Premises who has been excluded from the common areas by Owner/Agent; or b) stay in his/her unit, as defined in section 8 above, who has had his/her Rental Agreement terminated by Owner/Agent. No one will engage in conduct that endangers themselves or others. No one will enter or use any areas of the property that are not intended for use by residents such as roofs, attics, crawl spaces, maintenance shops, etc.

**23. INTERFERENCE WITH MANAGEMENT:** Resident and Resident's guests, invitees, occupants, or persons under Resident's control shall not interfere with management of the Premises. For purposes of this section, interference with management includes but is not limited to verbal harassment (e.g. screaming, yelling, swearing, or using profane or offensive words), written harassment (e.g. cyberbullying, sending mail or emails with profane or offensive words or posting untrue statements on-site or on-line), and physical harassment (e.g. assaulting, battering, intimidating, threatening physical harm, or preventing work to be performed) of the Owner/Agent, including any employees or agents thereof, or of prospective residents.

**24. UTILITY BILL-BACK:** For any utility "paid for/provided by" Resident as indicated above that is billed directly to Owner/Agent, Owner/Agent may require Resident to pay/reimburse Owner/Agent for said charges for a utility or service provided directly, or for a public service provided indirectly, to the Resident's dwelling unit or to a common area available to the Resident as part of the tenancy. The manner in which the charge is allocated among the Residents is subject to Owner/Agent's sole discretion and is based to change without notice provided that the annual amount charged to all Residents may not exceed the annual amount Owner/Agent pays for said utilities/services. If not provided herein or in the Utility Bill-Back Addendum, Owner/Agent shall provide an explanation of the manner in which charges are allocated among Residents in the bill each month.

**25. MALFUNCTIONS:** Resident will immediately report in writing all malfunctions of equipment, failures of essential services, or needs for repair. Resident shall not tamper with the heating system, plumbing system, appliances, locks, doors, light fixtures, smoke alarms or carbon monoxide alarms.

**26. RESIDENT LOSSES:** Owner/Agent shall not be liable for damages of any kind caused by the lack of heat, refrigeration or other services to the Premises arising out of any accident, act of God, or occurrence beyond the control of Owner/Agent. Resident shall be limited to the rights and remedies specified in the Oregon Residential Landlord and Tenant Act.

**27. CO-SIGNER:** If the obligations under this Rental Agreement are guaranteed by a co-signer, Resident agrees that Owner/Agent would not have rented without the guaranty. In the event the guaranty is terminated or becomes unenforceable for any reason, it will be considered a material non-compliance with this Rental Agreement.

**28. COMMUNITY RULES:** Unless Owner/Agent has custom rules and regulations for the property, the rules and regulations contained in Multifamily NW form M132 (Community Rules & Regulations) apply and are incorporated by reference herein.

**29. WRITTEN NOTICES:** All notices required under this Rental Agreement or state law to be in writing shall be served personally, by first class mail or by first class mail and attachment. If served by first class mail and attachment, a notice from Owner/Agent to Resident shall be deemed served on the day and at the time it is both mailed by first class mail to Resident at the Premises and attached in a secure manner to the main entrance of that portion of the Premises of which Resident has possession. If served by first class mail and attachment, a notice from Resident to Owner/Agent shall be deemed served on the day one copy is mailed by first class mail to Owner/Agent at the mailing address set forth on page one of this Rental Agreement and a second copy attached in a secure manner to the "Owner/Agent's Designated Location for Attached Notices" identified on page one of this Rental Agreement. If the Owner/Agent's Designated Location for Attached Notices is located inside a secured building, the notice should be attached to the main entrance of such building. Agent is authorized to accept notices on behalf of Owner.

**30. ACTUAL NOTICE:** Whenever state law requires actual notice, such notice may be served by one or more of the following methods: (a) verbally to Owner/Agent or Resident or by leaving a message on Owner/Agent's or Resident's answering machine or voicemail system; (b) written notice that is personally delivered to Owner/Agent or Resident, left at Owner/Agent's rental office, sent by facsimile to Owner/Agent's residence or rental office or to Resident's dwelling unit, or attached in a secure manner to the main entrance of Owner/Agent's residence or Resident's dwelling unit; (c) written notice that is delivered by first class mail to Owner/Agent or Resident, which notice shall be considered served three days after the date the notice was mailed; or (d) written notice electronically delivered to any email address, mobile phone number or other electronic method listed on the front of this Agreement or specified by either party in writing from time to time. Resident is responsible for keeping Owner/

Agent advised of any changes to his/her electronic delivery address/phone number. Utility bills may be delivered electronically or by methods (b) or (c) above.

**31. PARKING AND USE OF VEHICLES:** Unless Owner/Agent has custom parking rules for the property, all off-street parking is governed by the rules and regulations contained in Multifamily NW form M156 OR (Parking Agreement) which Resident acknowledges receiving and is incorporated by reference herein. Resident agrees to comply with all postal parking restrictions. Resident will drive in a safe manner and comply with all posted speed limit signs at all times, and if no posted speed limit sign, the speed limit is 5 miles per hour.

**32. CONTROL OF COMMON AREAS:** Owner/Agent and any person designated by Owner/Agent retain control over any common areas of the Premises for the purposes of enforcing state trespass laws and shall be the 'person in charge' for that purpose as that phrase is defined at ORS 164.205(5). If Owner/Agent excludes a person from the common areas, Resident may not invite such person into their unit or grant permission to such person to enter or remain on the common areas.

**33. HOMEOWNER ASSOCIATION ASSESSMENTS:** Resident will pay assessments, as defined in ORS 94.550 and 100.005, if the unit is within a homeowners association organized under ORS 94.625 or an association of unit owners organized under ORS 100.405, and: (A) The assessments are imposed by the association on Owner/Agent; (B) The assessments are imposed by the association on any person for expenses related to moving into or out of a unit located within the association; and (C) Owner/Agent gives a copy of the assessment to Resident before or at the time Owner/Agent charges Resident. Any assessment required to be paid by Resident under this section is due at the time a copy of the assessment is provided to Resident.

**34. REQUESTS FOR REASONABLE ACCOMMODATION/MODIFICATION:** As required under federal, state, and local fair housing laws, Residents with disabilities may request reasonable accommodations/modifications related to their housing. All requests must be made to the Owner/Agent specifying the nature of the requested accommodation/modification. It is recommended, but not required, that such requests be made in writing.

**35. TERMINATION FOR FALSE INFORMATION OR CRIMINAL CONVICTION:** If any information supplied in conjunction with application for this rental unit is later found to be false, or if any occupant is convicted of a crime during the tenancy that would constitute grounds for denial of tenancy under Owner/Agent's current rental criteria, this is grounds for termination of tenancy.

**36. RESCREENING.** Each Resident authorizes Owner/Agent to obtain a new or updated consumer credit report and/or an investigative consumer report: if any Resident requests to transfer to another unit; upon any change in either the Owner or Agent; annually; any Resident leaves or a new Resident is approved by Owner/Agent; or for any other valid business purpose. A consumer credit report or an investigative consumer report may include the checking of the Resident's credit, income, employment, rental history, and criminal court records and may include information as to his/her character, general reputation, personal characteristics, and mode of living. Each Resident has the right to request additional disclosures provided under Section 606 (b) of the Fair credit Reporting act, and a written summary of your rights pursuant to Section 609(c). Each Resident has the right to dispute the accuracy of the information provided to the Owner/Agent by the screening company or the credit reporting agency as well as complete and accurate disclosure of the nature and scope of the investigation.

**37. SIGHT UNSEEN.** If Resident has executed this Agreement without first visiting the unit, Resident's dissatisfaction with the unit at the time possession is delivered is not grounds to terminate this Agreement.

**38. COMPLETE AGREEMENT:** This Rental Agreement, any rules and regulations for the Premises, and, except as provided below, any other written addenda executed by the parties on or after the date of this Rental Agreement contain the entire understanding of the parties. There are no prior oral or written agreements unless they are referenced herein. If this is a renewal of an existing Rental Agreement, all written addenda executed on or after the date of the original Rental Agreement, to the extent consistent herewith, remain in effect and are incorporated herein.

PAGE 4 OF 4 ● RENTAL AGREEMENT

Form MGU1 OR Copyright ©2017 Multifamily NW · NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION. Revised 10/29/2017

Case 3:21-cv-00193-MO    Document 2    Filed 02/04/21    Page 68 of 97



**MULTIFAMILY NW**
The Association Promoting Quality Rental Housing

# COMMUNITY RULES & REGULATIONS

DATE 4/12/19    PROPERTY NAME / NUMBER  Milepost 5 Studios

RESIDENT NAME(S) Steven L. Stanley

UNIT NUMBER 216    STREET ADDRESS  850 NE 81st Ave.

CITY  Portland    STATE  OR    ZIP  97213

**DEFINITION OF COMMUNITY RULES & REGULATIONS**

As presently adopted, subsequently amended or modified, these Community Rules & Regulations are incorporated into the Rental Agreement executed or renewed this date and apply to all residents, their family, temporary residents and/or guests. Each Resident is responsible for ensuring that his/her family and guests know and follow the Community Rules & Regulations. "Management" means the Owner or Owner's Agent, and includes the resident manager, if any.

**GENERAL POLICIES AND COMMON AREAS**

1. Unit entry areas, balconies, decks, patios and backyards are not storage areas. Areas visible to the outside must be kept neat and free of clutter: no trash, laundry, broken furniture, dead plants, empty boxes, storage items or unsightly objects are allowed in these areas. No trampolines, bounce houses, pools, hot tubs, sandboxes, etc. are allowed on decks, patios or backyards.
2. Common entrances, passageways or driveways must not be obstructed or used by residents for any purpose, other than entrance and departure.
3. Garbage cans, household supplies, bottles and cans and other similar articles shall not be placed outside the unit.
4. No part of the common areas will be used for commercial activities of any kind. This shall not apply to the use of units by Management for display, marketing, or promotional purposes.
5. No structure of a temporary character, such as trailer, tent, shack, barn or other building, trampoline, bounce house, pool, hot tub, sandbox, etc. will be allowed in the common areas at any time.
6. Modifications to the unit or any common areas are prohibited without Management's prior written approval.
7. To request maintenance in his/her unit, Resident must obtain a maintenance and repair request form from Management. This form must be completed and signed by Resident.
8. Excessive noise and activities such as skateboarding, roller-skating, roller-blading and sledding are not allowed.
9. Running and/or playing in the parking lot is prohibited.
10. Per the Rental Agreement, quiet time begins at 10:00 PM.
11. Residents are responsible for the conduct of their guests, who are expected to follow these Community Rules & Regulations.
12. No alcoholic beverages are to be consumed in the common areas or parking lots.
13. No resident shall cause or permit anything, including but not limited to, signs, awnings, canopies, shutters, radio or television antennas, satellite dishes or air conditioners, to be displayed or affixed to the unit unless allowed by law or written approval is granted by Management.
14. Nothing shall be done in any unit, or in common areas, which will impair the structural integrity of the building.

**COMMON AREA FACILITIES**

☐ Pool/Spa ☐ Laundry ☐ Fitness Room ☐ Recreation Room ☐ Other

Please observe any and all applicable addendums and/or posted community rules and regulations relating to above recreational facilities. In the event this Community has no specific common area facility rules and regulations, see page 2 for general information concerning this subject.

**INSIDE YOUR HOME**

1. No Venetian blinds, awnings, draw shades or non-conforming curtains or drapes shall be installed on exterior windows without the written permission of Management. This includes reflector shades, tin foil, etc.
2. No painting, staining or papering shall be done without the prior written permission of Management.
3. Picture hooks are to be used for hanging pictures, mirrors or decorative items on the wall. Adhesive materials are not allowed.
4. No signs, banners, or placards shall be posted in or about the Community without the written permission of Management.
5. Residents shall not conduct or permit the noisy use of any musical instrument, operation of radio(s) (including vehicular stereo or radio), television, amplifier or loud speaker(s) in a manner which disturbs the residents of any other unit.

**INSURANCE**

1. No resident shall keep or do anything in any unit or common area which will increase the rate of insurance on the buildings or contents beyond that customarily applicable for residential rental housing use.
2. No resident shall permit anything to be done or kept in any unit or common area which will result in the cancellation of insurance on any building, or its contents, or which would be in violation of any federal, state, county, or city regulatory authority.
3. Owner/Agent is not responsible for personal property left in the common area and facilities or any other location on the Premises.
4. INSURANCE REMINDER: OWNER/AGENT'S INSURANCE POLICY DOES NOT COVER THE CONTENTS OF RESIDENT'S UNIT OR PERSONAL LIABILITY. IF RENTAL AGREEMENT DOES NOT REQUIRE, WE RECOMMEND THAT RESIDENT OBTAINS A RENTER'S INSURANCE POLICY. IF RESIDENT DOES NOT HAVE THIS INSURANCE, WE STRONGLY URGE RESIDENT TO CONTACT HIS/HER INSURANCE AGENT WITHOUT DELAY.

➤ Resident initials ___

**SECURITY**

Security is very important to all residents living at our Community.

1. Should anything suspicious occur, report it immediately to the police and Management.
2. Use all locks on doors and windows.
3. If Management provides lockout services, then lockouts occurring after office hours are subject to a $_____ charge ($25 if left blank).

**FAIR HOUSING LAWS**

It is a violation of federal, state and local fair housing laws for any resident or their guests to harass, threaten or intimidate any other resident and/or their guests because of race, national origin, religion, disability, gender, marital status, familial status (presence of children), source of income, sexual orientation, gender identity, or any other protected class. Owner/Agent will respond to any complaints of such behavior with appropriate action, which may include termination of the tenancy of the violating resident. Reports of inappropriate behavior, including details of the incident, are preferred to be received in writing, but will be accepted in other forms. Owner/Agent will not retaliate against anyone for reporting any such behavior.

I have read, understand and agree to comply with both pages of these Community Rules & Regulations, including any future changes of which I receive written notice. (Must be signed by each adult resident)

X Steven L. Stanley    4/12/19    X
   RESIDENT    DATE    RESIDENT    DATE

X    X
   RESIDENT    DATE    RESIDENT    DATE

X
   OWNER/AGENT    4/12/2019
    DATE

PAGE 1 OF 2

Form AH32 OR-WA Copyright © 2013 Multifamily NW™ NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION. Revised 3/7/2013.



## MOLD & MILDEW ADDENDUM

DATE X 4/12/19    PROPERTY NAME / NUMBER __Milepost 5 Studios__

RESIDENT NAME(S) X Steven L. Stanley

UNIT NUMBER 216    STREET ADDRESS 850 NE 81st Ave.    and all others.

CITY Portland    STATE OR    ZIP 97213

Mold growth indoors is an issue common in the Pacific Northwest. Mold spores naturally exist indoors and cannot be eliminated. Normally, they do not grow or reproduce on indoor surfaces and become visible and pose a problem unless a condition of excess moisture exists at surfaces. The main causes of mold growth are too much moisture generation, too little moisture removal, or cold surfaces. For example, mold often grows around windows because blinds or shades are always kept closed, thus cooling the window area and causing mold growth. Those causes of mold growth can be reduced or eliminated by simple procedures under your control. To reduce mold and mildew, Resident agrees to the following:

**Keep the indoor humidity low:**
- Use bathroom fans during and for at least 30 minutes (preferably 1 hour) after showering and bathing. If no fan is available, open windows slightly for ventilation for the same amount of time.
- Use the exhaust fan above the stove whenever cooking or boiling liquids, or if no fan (or if a recirculating fan exists that does not exhaust to the outdoors), open a window slightly for ventilation during cooking or boiling.
- Use the fan in the laundry area during and for 20 minutes after using the washer (not the dryer if it exhausts outdoors), or if no fan, open a window slightly for ventilation.
- Cover fish tanks.
- Do not use unvented space heaters, such as kerosene heaters, indoors.
- Do not use your oven for space heating.
- Do not keep excess number of house plants.

**Prevent cold surfaces that promote mold growth:**
- Raise blinds or shades as often as possible each day (extremely important)!
- Allow at least one inch between furniture and walls to warm wall surfaces.

**Keep the indoor temperature at least moderately warm during non-summer months:**
- Keep heat above 60 degrees Fahrenheit at all times, as low temperatures cause mold growth.
- Do not turn off the heat in any rooms (especially bedrooms).
- Open closet doors.

**Attend to spills or flooding:**
- Immediately dry any water that spills or overflows from showers, tubs, toilets, sinks, etc.
- Immediately clean up and thoroughly dry any spills onto carpets, rugs or floors.

**Immediately notify Owner/Agent of any excess moisture problems:**
- Immediately notify Owner/Agent of any water leakage such as leaking plumbing, tubs, showers, toilets or windows.
- Immediately notify Owner/Agent of any running water—plumbing, tubs, showers or toilets.

**Clean regularly and thoroughly:**
- If mold appears on any indoor surfaces, immediately scrub it off with soap and water (bleach is not necessary), and then rinse and dry the surface.
- Check, clean and dry window tracks and keep free from condensation buildup.
- Once you have attempted to clean mold, if it reappears or you are not able to remove it, immediately report the mold to Owner/Agent.

**Read the EPA pamphlet: "A Brief Guide to Moisture, Mold and Your Home"** available at http://www.epa.gov/mold/moldresources.html

Resident understands and agrees that failure to do any of the actions in this Mold & Mildew Addendum shall constitute a material non-compliance with the Rental Agreement. Resident will be financially responsible for all damage resulting from his/her failure to comply with this Mold & Mildew Addendum.

xX Steven L Stanley    X 4/12/19    X _____
RESIDENT    DATE    RESIDENT    DATE

X _____    X _____
RESIDENT    DATE    RESIDENT    DATE

X _____    X _____
RESIDENT    DATE    RESIDENT    DATE

X M Thompson 66    4/12/201
OWNER/AGENT    DATE

Form M339 OR Copyright © 2010 Metro Multifamily Housing Association* NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION. Revised 9/7/10

Exhibit A, pg. 6 of 16



**MULTIFAMILY NW**
The Association Promoting Quality Rental Housing

# NO-SMOKING ADDENDUM

DATE X 4/12/19    PROPERTY NAME / NUMBER  _Milepost 5 Studios_

RESIDENT NAME(S) X  _Steven F. Stanley_

UNIT NUMBER  _217_    STREET ADDRESS  _850 NE 81st Ave._

CITY  _Portland_    STATE  _OR_    ZIP  _97213_

Due to the increased risk of fire, increased maintenance costs, and the possible health effects of secondhand smoke, Owner/Agent is adopting the following no-smoking policy which covers all or a part of the Property (defined below). The following terms, conditions and rules are hereby incorporated into the Rental Agreement.

**1. PROPERTY SUBJECT TO NO-SMOKING POLICY**
(Check paragraph that applies):

☑ The whole property is no-smoking including but not limited to all buildings, units, porches, patios, balconies, yards, garages, parking areas and other common areas (collectively the "Property").

☐ Only a portion of the Property is no-smoking.

☐ The units (including porches, patios, balconies, yards, etc. within the building(s)) located at:

_____ are no-smoking, along with all common areas within ___ ___ feet of the no-smoking buildings (if left blank then 10 feet in Oregon and 25 feet in Washington).

☐ The following designated areas of the Property are no-smoking:

☐ Resident's unit (including porches, patios, yard, etc.) is no-smoking.

☐ Smoking is only permitted in the following areas:

☐ Resident's unit is in a smoking-permitted building.

**Note: Smoke damage will never be considered normal wear and tear.**

**2. DEFINITION OF SMOKING.** The term "smoking" means inhaling, exhaling, breathing, carrying, or possessing any lighted cigar, cigarette, pipe, other tobacco product or similar lighted product in any manner or in any form.

**3. NO-SMOKING PROPERTY.**

3.1 (Complete Property). Resident agrees and acknowledges that the Property has been designated as a no-smoking living environment. Resident agrees that he/she will not smoke anywhere on the Property or adjacent to and within 10 feet (OR) or 25 feet (WA) of any portion of the Property. Resident will not permit any guests or visitors of Resident to do so.

3.2 (Designated Portions of Property No-Smoking). Resident agrees and acknowledges that designated portions of the Property have been designated as no-smoking. Resident agrees that he/she will not smoke on the no-smoking portion of the Property and will not permit any guests or visitors of Resident to do so.

3.3 Resident agrees to inform all of his/her guests or visitors of the no-smoking policy and to require any guest or visitor who violates the policy to leave. Resident is responsible for the actions of his/her guests and visitors.

3.4 (Oregon & Washington). Oregon and Washington laws prohibit smoking in any space "open to the public" such as the rental office of the Property or within 10 feet (OR) or 25 feet (WA) of the entrances or windows of such public space. Resident agrees to comply with the applicable law and require his/her guests and visitors to comply also.

**4. OWNER/AGENT NOT A GUARANTOR OF SMOKE-FREE ENVIRONMENT.** Resident acknowledges that Owner/Agent's adoption of a no-smoking policy, and the efforts to designate all or some of the Property as non-smoking, do not make Owner or any of its managing agents the guarantor of Resident's health or of the smoke-free condition of the non-smoking portions of the Property. However, Owner/Agent will take reasonable steps to enforce the no-smoking policy. Owner/Agent is not required to take steps in response to smoking unless Owner/Agent has actual knowledge of the smoking and the identity of the responsible resident.

**5. OWNER/AGENT DISCLAIMER.** Resident acknowledges that Owner/Agent's adoption of a non-smoking living environment, and the efforts to designate all or portions of the Property as non-smoking, does not in any way change the standard of care that Owner/Agent has under applicable law to render the Property any safer, more habitable or improved in terms of air quality standards than any other rental premises. Owner/Agent specifically disclaims any implied or express warranties that the Property will have any higher or improved air quality standards than any other rental property. Owner/Agent cannot and does not warranty or promise that the Property will be free from secondhand smoke. Resident acknowledges that Owner/Agent's ability to police, monitor or enforce this Addendum is dependent in significant part on voluntary compliance by residents and residents' guests. Residents with respiratory ailments, allergies or other conditions relating to smoke are put on notice that Owner/Agent does not assume any higher duty of care to enforce this Addendum than any other Owner/Agent obligation under the Rental Agreement.

**6. EFFECT ON CURRENT RESIDENT.** Resident acknowledges that current residents residing on the Property under leases/rental agreements signed prior to adoption of this no-smoking policy may not be immediately subject to this no-smoking policy. As current residents move out, have current leases expire or enter into new leases/rental agreements, the no-smoking policy will become effective for them and their guests.

**7. EFFECT OF BREACH.** Resident understands and agrees with the conditions of this Addendum and that failure to adhere to any of the conditions of this Addendum will constitute both a material non-compliance with the Rental Agreement and a serious violation of the Rental Agreement. In addition, Resident will be responsible for all costs to remove smoke odor or residue upon any violation of this Addendum.

☐ If checked, the effective date of this Addendum will be _____ when the Property is converting to no-smoking. If not checked, this Addendum is effective immediately.

X  _Steven F. Stanley_    X  _4/12/19_    X _____
RESIDENT                        DATE              RESIDENT                        DATE

X _____    _____    X _____    _____
RESIDENT                        DATE              RESIDENT                        DATE

X  _Thompson_    _4/12/19_
OWNER/AGENT                        DATE



OREGON
# SMOKE ALARM/
# CARBON MONOXIDE ALARM

MULTIFAMILY NW
The Association Promoting Quality Rental Housing



DATE X 4/12/19    PROPERTY NAME / NUMBER   Milepost 5 Studios

RESIDENT NAME(S) X Steven L. Stanley

UNIT NUMBER 216    STREET ADDRESS   850 NE 81st Ave.

CITY   Portland    STATE  OR   ZIP  97213

## SMOKE ALARM

A ☐ 10-Year Battery ☐ Electric ☑ Electric with Battery Backup powered smoke alarm has been installed in the above-noted unit for resident protection. The smoke alarm was tested by the Owner/Agent on _____ and found to be in working condition.

## CARBON MONOXIDE ALARM

If required, a ☐ Battery ☐ Electric ☑ Electric with Battery Backup powered carbon monoxide alarm has been installed in the above-noted unit for resident protection. The carbon monoxide alarm was tested by the Owner/Agent on _____ and found to be in working condition.

THE RESIDENT SHALL: TEST THE ALARMS AT LEAST EVERY SIX MONTHS AND REPLACE THE BATTERIES AS NEEDED; AND NOT REMOVE OR TAMPER WITH A PROPERLY WORKING SMOKE ALARM AND/OR A PROPERLY WORKING CARBON MONOXIDE ALARM, INCLUDING REMOVING WORKING BATTERIES. OWNER/AGENT MAY CHARGE RESIDENT A FEE OF UP TO $250.00 FOR ANY NON-COMPLIANCE WITH THESE DUTIES.

> **TESTING THE SMOKE ALARM AND CARBON MONOXIDE ALARM**
> Test by pushing the button on the cover. The alarm will sound if all electronic circuitry, horn and battery are working. If no alarm sounds, the unit has a defective battery or other failure. You can also test the smoke alarm by blowing smoke into it.
>
> **SMOKE ALARM HUSH FEATURE**
> If the smoke alarm has a hush feature, you can silence the alarm by pushing the hush button on the cover and holding for three seconds.
>
> **BATTERY REPLACEMENT (where applicable)**
> If the alarm is powered by a 10-year battery, it may not last for 10 years. The alarm has a low-battery indicator which will "chirp" at 30-second intervals for a minimum of 7 days. Replace the battery when chirping occurs. If the alarm is equipped with a 10-year battery, replace it only with a 10-year battery. If the alarm is electric with battery backup, use Mallory MN1604 or Eveready 552 9-volt alkaline battery or equivalent sold at most drug, department, hardware or electronic parts stores. Never use an ordinary or heavy-duty carbon-zinc battery.

**It is your responsibility to report any deficiency in either the smoke alarm or carbon monoxide alarm to the Owner/Agent immediately in writing. The Owner/Agent will correct the deficiency as soon as practical.**

X Steven L. Stanley    X 4/12/19    X _____
RESIDENT                 DATE           RESIDENT              DATE

X _____         _____  X _____
RESIDENT                 DATE           RESIDENT              DATE

X _____         _____  X _____
RESIDENT                 DATE           RESIDENT              DATE

                                        X _____  4/12/2019
                                        OWNER/AGENT        DATE

MFNA /OR Copyright © 2014 Multifamily NW. ANY USE OF THIS FORM IS PROHIBITED WITHOUT WRITTEN PERMISSION. Revised 06/2014



**MULTIFAMILY NW**
The Association Promoting Quality Rental Housing

OREGON
# CRIMINAL ACTIVITY ADDENDUM

DATE X 4/12/19    PROPERTY NAME / NUMBER   *Milepost 5 Studios*

RESIDENT NAME(S) X   *Steven L. Stanley*

UNIT NUMBER 216    STREET ADDRESS   *850 NE 81st Ave.*    **and all others.**

CITY   *Portland*    STATE *OR*    ZIP *97213*

Resident and Owner/Agent agree as follows:

1. Resident, members of Resident's household, guests, or any other person under Resident's control **shall not engage in criminal activity, as defined in federal or state law, including illegal drug activity, on or near the Premises and shall not engage in any activity that constitutes a threat to people or property on or near the Premises.** These activities are material violations of the rental agreement.

2. In addition to any other remedies allowed by law, as described in ORS 90.396, Owner/Agent, after 24 hours' written notice specifying the cause, may *immediately* terminate the Rental Agreement in any of the following situations:

    a) Resident or someone in Resident's control seriously **threatens to inflict substantial personal injury, or inflicts any substantial personal injury,** upon a person on the Premises other than Resident;

    b) Resident or someone in Resident's control **recklessly endangers a person on the Premises** other than Resident by creating a serious risk of substantial personal injury;

    c) Resident or someone in Resident's control **inflicts any substantial personal injury** upon a neighbor living in the immediate vicinity or **intentionally inflicts any substantial damage to the Premises;**

    d) Resident **intentionally provided substantial false information on the application** for the tenancy within the past year; and the false information was with regard to a criminal conviction of Resident that would have been material to Owner/Agent's acceptance of the application;

    e) Resident or someone in Resident's control commits **any act that is outrageous in the extreme** on the Premises or in the immediate vicinity of the Premises. Such acts include, but are not limited to:

        i) **Prostitution or promotion of prostitution,** as described in ORS 167.007 and 167.012;

        ii) **Manufacture, delivery or possession of a controlled substance,** as described in ORS 475.005, subject to the limitations defined in ORS 90.396(1)(f)(B);

        iii) **Intimidation,** as described in ORS 166.155 and 166.165; or **burglary** as described in ORS 164.215 and 164.225.

    f) With regard to "acts outrageous in the extreme" as described in this section, an act can be proven to be outrageous in the extreme even if it is one that does not violate a criminal statute.

    g) Similar notices, but often with an option to cure, may be served in cases where certain of the above violation(s) are caused by Resident's pet.

    h) Regarding prohibited acts defined by criminal statutes, **Owner/Agent's standard of proof for termination of the Rental Agreement remains the civil standard,** proof by a preponderance of the evidence.

3. Resident and other persons on the Premises with the consent of Resident shall conduct themselves in a manner that **will not disturb the neighbors' peaceful enjoyment of the Premises.**

4. Owner/Agent retains control over any common areas of the Premises for the purposes of enforcing state trespass laws and shall be the "person in charge" for that purpose as that phrase is defined in ORS 164.205(5). Common areas are locations shared by residents, such as laundry rooms, courtyards, hallways between dwellings, building entryways, and parking lots. This clause does not apply on property where there are no areas commonly shared by multiple residents (e.g., most single family detached dwellings).

5. In the case of conflict between the provisions of this addendum and any other provisions of the Rental Agreement, the provisions of this addendum shall govern.

6. This addendum is incorporated into the Rental Agreement executed or renewed this day between Resident and Owner/Agent.

xX *Steven L. Stanley*      X 4/12/19        X _____      _____
  RESIDENT                    DATE             RESIDENT                    DATE

X _____       _____   X _____
  RESIDENT                    DATE                    RESIDENT

                                                    X *[signature]*        4/12/2019
                                                      OWNER/AGENT          DATE

Form M056 OR Copyright © 2013 Multifamily NW™ NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION. Revised 3/18/2013.



**MULTIFAMILY NW**
The Association Promoting Quality Rental Housing

## SAFETY ADDENDUM


EQUAL HOUSING OPPORTUNITY

DATE X *4/12/19*    PROPERTY NAME / NUMBER *Milepost 5 Studios*

RESIDENT NAME(S) X *Steven L. Stanley*

UNIT NUMBER *216*    STREET ADDRESS *850 NE 81st Ave.*    and all others.

CITY *Portland*    STATE *OR*    ZIP *97213*

---

**WARNING!!** The Owner and its Agents cannot be responsible for watching and supervising children's activities. Various state and federal laws prohibit the Owner/Agent from imposing rules and regulations which discriminate against children. THEREFORE, PARENTS AND THOSE PERSONS HAVING CARE, CUSTODY OR CONTROL OF CHILDREN ARE RESPONSIBLE FOR THE SUPERVISION, SAFETY AND WELL-BEING OF THOSE CHILDREN. Following are some areas of the property that may pose special dangers to children who may not be aware of the risks. This list is not meant to cover all possible dangers that may be present.

### WINDOWS
- Open windows present a potential risk of falling.
- Window screens are intended solely to keep bugs out. They are not intended to support a person's weight or prevent a person from falling from an open window.
- There is a risk of serious injury or death if a person leans against a screen.
- Parents must keep their children from sitting or playing on window sills, and, for child safety, should keep windows shut and locked when children are left unattended.
- Keep furniture and other objects on which a child can climb away from windows.
- Window stops and other devices that restrict a window from opening are not provided by the Owner/Agent because of the dangers associated with fire and the requirement that occupants can escape. If Resident desires to use such devices, they must be approved by Owner/Agent before being installed. Resident accepts full responsibility for the safe use of such devices.
- Do not block windows in any way that would prevent exit in the event of a fire.

### USE OF APPLIANCES
- Stoves, ovens and fireplaces can cause burns and start fires if not properly used and attended.
- Hot water can cause burns if not properly used and attended.

- Children can turn on stove burners and ovens. Never place anything on stove burners or in the oven except when actually cooking.
- Never allow anything, except approved plugs, to be placed in electrical sockets.

### PARKING LOTS
- Moving vehicles can cause serious injury or death.
- It is hard to see any persons moving around vehicles.
- Riding bicycles, tricycles, skate boards, etc. in the parking areas increases the risk to children because they may not be able to control their movements and are not easily seen.
- Playing in or around vehicles is dangerous.

### DUMPSTERS & TRASH COMPACTORS
- Dumpsters can move or fall, causing injury or death.
- Trash or items in the dumpster can fall, causing injury or death.
- Trash in or around the dumpster may contain dangerous items such as broken glass, chemicals or sharp objects.
- Trash compactors include machinery that can cause serious injury or death if improperly used.

### EXERCISE EQUIPMENT
- Improper use of exercise equipment can lead to serious injury or death.
- Improper use of exercise equipment can cause serious damage to the equipment.

### SWIMMING POOLS, SPAS & SAUNAS
- State laws limit the use of pools, spas and saunas by children under 14 unless supervised by an adult. All residents must follow such laws.

### WATER
- Any location where water pools more than one inch deep poses the risk of drowning.
- Danger can be present with bathtubs, sinks, buckets, fountains, streams and ponds.

### BALCONIES, DECKS & SECOND STORY WALKWAYS
- Small children can crawl through railings.
- No one should climb on or over railings.
- Throwing objects off balconies, decks and walkways can cause injury or death to persons below.
- Do not place furniture or other objects on which a child can climb near railings.
- Keep all stairways clear of debris or obstructions.
- Report any damaged or loose railings to Owner/Agent immediately.

### PLAY AREAS
- Improper use of play equipment can cause injury or death.
- Any damaged or improperly working play equipment should be reported to Owner/Agent immediately.

Form M126 OR-WA Copyright © 2013 Multifamily NW™ NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION. Revised 8/17/2013.

---

X *Steven L. Stanley*    X *4/12/19*    X _____    _____
RESIDENT                    DATE            RESIDENT              DATE

X _____    _____    X _____    _____
RESIDENT                    DATE            RESIDENT              DATE

X *Wm Thompson*    *4/12/2019*
OWNER/AGENT                DATE

# Workshop Safety

## <u>Personal Safety Gear Required</u>

- **Safety Glasses:**
  Vision is important. Bad things happen by accident. Wear them. Safety glasses also protect your eyes from *chemical* injury -- remember to use them when cleaning brushes, mixing chemicals together, etc. If you are doing a lot of liquid work, get a pair of the spill-proof chemical style goggles as well. They aren't good for all-around use, they tend to fog up. A full-face shield is another option, especially if working with tools which throw large things, such as a lathe.
- **Hearing Protectors:**
  Many of the power tools in the shop, both small and large, output damaging intensity and frequency of sound. Routers and Table saws are the two worst offenders which are popular that come to mind. Exposure to sound tires us just as labor does; using hearing protectors for longer exposure to quieter tools can be a benefit.
- **Push sticks:**
  Keep your fingers away from spinning blades on Saws, Router tables, jointers and other tools.
- **Shop clothes:**
  They are a safety item because proper shop clothes won't get tangled in your machines. You won't go out of the way to avoid dirtying your good clothes, and put yourself at risk inadvertently. Long sleeves and pants provide armor which help protect your skin from splinters and from flying debris from power tools. They protect your skin from chemical splashes. Good boots protect your feet from the dropped razor-sharp chisel, a falling piece of wood or random sharp trash on the floor.
- **Dust Mask:**
  Cutting wood produces dust, which floats in the air. This dust is collected by our lungs and nasal passages. Some of the wood-dust can be really bad for you. Too much exposure to non-toxic wood dust can be bad for you. Worst case, the exposure to the dust can cause chronic (long term) allergies. There are some really fancy dust masks, even powered filtered ones available. At the least, you want one with a metal nose bridge, so you can form the mask around your nose. That is one of the more difficult places to seal, and it also prevents moisture from escaping and fogging your safety glasses.
- **Fume Mask:**
  Some solvents and finishes are irritating. Some can even make you loopy (aka affect your consciousness). A sealed fume mask with the proper canisters for the solvents or materials you are using keeps these away from your lungs and bloodstream. You can extend the life of the canisters by keeping them sealed in airtight containers or bags when you aren't using the mask. Keep spare canisters in the shop.

**The easiest way to use safety gear in the workshop is to use it reliably. Make the safety gear the first thing you touch when entering the workshop. Make it the last thing that comes off when you leave the workshop. Use it whenever you are in the workshop, even if you aren't planning on doing anything. We cannot stress that more strongly -- make it an ingrained habit to have those glasses on in the workshop. Then think about wearing them for other projects when you get some tools from the workshop. One day you may find yourself wearing them while eating lunch out of the workshop -- way better than not having them one when you need them.**

**MILEPOST**    Community for Creatives          900 NE 81st Ave, Portland, OR, 97213

milepostfive.com

## Milepost 5 Studios Rental Agreement Addendum

The mission of Milepost 5 Studios includes creating an affordable, productive and sustainable live/work environment for Creatives. In order to promote this type of community, all Residents of Milepost 5 Studios are subject to the following rules and regulations, which are in addition to the terms of the Rental Agreement. These rules and regulations are consistent with State of Oregon Landlord/Tenant Law. Please keep in mind that the dual principles of respect and consideration should always be your guide.

Landlord may from time to time reasonably amend or supplement the rules and regulations included in this Addendum.

1. <u>Rents</u>:  Due and payable on the first day of each month.

2. <u>Subletting</u>: Residents shall not assign or sublet their unit/s without the prior written consent of Management.

3. <u>Parking</u>: Do not block driveways when parking on the street. Please do your best to leave room for as many parking spaces as possible when parking in front of our neighbors' homes. The parking lot is for reserved parking. Unauthorized parking is subject to towing. You may rent a parking spot in the parking lot for $45/month, or $75/month for a tandem (double) spot, subject to availability.



4. <u>Noise</u>: Excessive noise curfew is 10:00 PM-7:00 AM Sun-Thurs, & 11:00PM-7:00 AM Fri-Sat. Disorderly conduct shall be grounds for notice to terminate your Rental Agreement. Residents shall restrict vocal, instrumental, radio and television noise to a reasonable degree. During the day reasonable noise is such that does not disturb others; and during the night, it is such that cannot be heard outside of the dwelling. Residents shall conduct themselves, and require their guests to conduct themselves, in a manner that will not disturb their neighbors' peaceful enjoyment of their unit.

5. <u>Musical Instruments</u>: Use of amplified instruments or drums are not allowed in the building, with the exception of the 1st floor performance space or other specifically designated areas.

6. <u>Pet Policy</u>: The Milepost 5 Studios is a pet free community. Residents are prohibited from having pets live with them.

7. <u>Unit Maintenance, Garbage and Recycling</u>: Residents are responsible for cleaning his/her own unit and shall keep the unit free of accumulations of debris, filth, garbage, rodents and vermin.

1 | P a g e

Exhibit A, pg. 12 of 16

Residents shall be responsible for transporting waste, rubbish and recycling from their unit in  sealed plastic garbage bags to the receptacles on the West side of the Building. Dumping of  furniture and other move-out related debris is forbidden; all collection and removal charges will  be deducted from your security deposit.  All costs related to elimination of infestation will be  charged to the Resident.

8.  <u>Air Conditioners and Energy Loading</u>: Due to energy loads, air conditioners are prohibited in the  building. Residents shall not install, operate or maintain in the units or in any other area of the  Building, electrical equipment that would overload the electrical system beyond its capacity, for  proper, efficient and safe operation as determined solely by Management. Residents shall not  furnish additional cooling or heating to their unit, including the use of electronic or gas heating  devices, without Management's prior written consent.

*Energy efficient refrigerators and microwaves are recommended for use in individual units.

9.  <u>Water and Electrical Usage</u>: Please be green and conserve water and electricity use. Please do not  let water run unnecessarily and turn off lights that are not in use. Utility costs are shared by all residents.

10. <u>Lighting</u>: Residents are responsible for replacing light bulbs in their units.

11. <u>Plumbing</u>: Plumbing fixtures and appliances shall be used only for the purposes for which  designed; no sweepings, rubbish, rags or other unsuitable materials shall be disposed of in the  fixtures or appliances. Damage resulting to fixtures or appliances caused by Resident[s], and  their agents, employees or invitees, shall be paid for by Resident[s], and Management shall not  be responsible for the damage.

12. <u>Elevator</u>: The elevator will be used strictly in compliance with rules posted therein, including  weight limits. Elevator weight limits will be posted.

13. <u>Common Kitchens</u>: Please do not leave any personal items, including food, utensils, dishes, pots  or pans, in the common kitchen. Resident[s] must clean up any and all messes they've created  after using the common kitchen. Failure to do so will lead to a cleaning charge of up to $100.00.  Management is not responsible for loss of any personal items left in the common kitchen. A  common refrigerator is provided in the kitchens for temporary use.

14. <u>Shared Bathrooms</u>: Residents must not leave any personal property behind in the shared  bathrooms. Residents must clean up the bathrooms after use, including wiping up excess water  and disposing of all trash.

15. <u>Laundry Facility and Usage</u>: The Laundry Room is open for use between 8:00 AM and 10:00 PM  daily. Residents must remove personal property from the Laundry Room when finished.  Management is not responsible for any property lost in or stolen from the laundry room.

\*Management will remove all property left behind in the Laundry Room.

\* Residents must clean out the lint trap after using the dryer. Please do not use more than two washing machines and two dryers at any one time. Residents will observe other posted rules. Management and Building Owners are not responsible for any damage or loss related to the Laundry equipment usage.

16. Common Sinks: Common sinks are located throughout the building and are available for use by Residents. Residents must clean the sink/s after use. Failure to clean may result to a cleaning charge of up to $100.

17. Egress: Walkways and stairways must remain clear and may not be blocked. Residents may not use hallways as storage, except as otherwise provided for herein.

18. Chemicals and Hazardous Materials: No flammable, explosive or dangerous fluids or substances may be used or kept by Residents in their studios, the building, or on the property. Resident shall not, without Management's prior written consent use, store, install, spill, remove, release or dispose of, within or about the premises or any other portion of the building, property or project, any asbestos-containing materials or any solid, liquid, or gaseous material that is now or subsequently considered toxic or hazardous under the provisions of 42 U.S.C. Section 9601 et seq. or any other applicable environmental law which may now or later be in effect.

\*With regard to art -making, proper ventilation of the unit is the responsibility of the Resident. Use of sprays and fixatives is relegated to designated common workshop space located on the first floor.

19. No Smoking: Management has designated the Building (including the units and inner courtyard) as a non-smoking building. Smoking is allowed only in the outside designated smoking areas.

20. Smoke Alarms: Residents shall be responsible for testing smoke alarms and reporting IN WRITING any malfunctioning smoke alarm units to Management. Management shall not be held liable for death or injury to persons or property resulting from the mechanical failure of a smoke alarm required under Oregon law. Residents shall not remove or tamper with a properly functioning smoke alarm.

21. Improvements and Alterations: Any improvements or alterations to a unit must be approved by Management, in writing, prior to any installation or alteration. All approved improvements or alterations are at the expense of the Resident. Any unauthorized alterations or improvements will result in the immediate termination of the Rental Agreement and may include a fine.

22. Tile Subflooring: Resident understands that the subflooring in their unit could be vinyl asbestos tile (VAT). If covered by carpet or other suitable floor covering, VAT is considered encapsulated. In the event carpet is damaged or removed, and the subfloor is subsequently exposed, Resident

Exhibit A, pg. 14 of 16


shall immediately contact Management which will replace the carpet or employ another method to again encapsulate the subfloor.

23. <u>Unit Security</u>: Doors to units should be kept locked. Management will not be responsible in any way for theft or damage to personal property belonging to Residents, located in their dwelling unit or other areas of the Building. The Resident must maintain in force his/her own fire and theft insurance for personal property, and liability insurance coverage for damage, fire or injury caused by themselves or their guests.

24. <u>Locks and Keys</u>: Resident shall not place any lock(s) on any door in the unit or Building without Management's prior written consent. Management shall have the right to retain at all times and to use keys to all locks within and into each unit. All keys shall be returned to Management at the expiration or early termination of the Rental Agreement.

25. <u>Security</u>: Management may from time to time adopt systems and procedures for the security and safety of the Building, its occupants, entry, use and contents. Resident, its agents, employees, contractors, guests and invitees shall comply with Management's systems and procedures.

26. <u>Showing Art</u>: Space throughout the Studios building has been dedicated to showing art by the Residents. All Residents interested will have a chance to show art. This will be facilitated by a sign-up list overseen by Management. Artwork cannot be hung in the hallways or common spaces without prior approval of Management. Management and ownership shall not be liable for any damage to or theft of Residents art displayed in the Building common areas.

27. <u>Care of Art</u>: Residents and guests of residents are expected to respect and care for all art that is hung on the walls in the hallways and in the gallery and any other sculptures or installations throughout the building. If residents or guests of residents are found to be stealing art or defacing an art piece or tampering with it in any way you shall be found to be in material non-compliance with this Rental Agreement, and appropriate action may be taken.

28. <u>Volunteer Hours</u>: Each Resident is expected to do 30 hours of volunteer service each year. Milepost 5 believes that volunteering is a great way to create and maintain community. Volunteer hours can be spent working here at Milepost 5 or anywhere else you desire. For a list of volunteer possibilities, please contact our leasing office at 503-333-3331.

**Nothing contained herein shall be construed as waiving any of the Owner/Agent's or Resident's rights under the laws of the State of Oregon. Resident acknowledges receipt of this agreement.**

_____    _____        X̄Steven L. Stanley    X 4/12/19
Owner/Agent            Date            Resident            Date

4/12/2019

    Steven L. Stanley    _____
      Resident            Date

 

**MULTIFAMILY NW**
The Association Promoting Quality Rental Housing

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS



DATE X 4/12/9    PROPERTY NAME / NUMBER _Mile Post 5    # 216_

RESIDENT NAME(S) X _Steven L. Stanley_

UNIT NUMBER _216_    STREET ADDRESS _850  NE  81st  Ave_

CITY _Portland_    STATE _OR_    ZIP _97213_

**LEAD WARNING STATEMENT:** Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a Federally approved pamphlet on lead poisoning prevention.

**LESSOR'S DISCLOSURE: (INITIAL)** _____

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

☐ (i) Known lead-based paint and/or lead-based paint hazards are present in the housing (explain):

_____

_____

☑ (ii) Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the Lessor (check (i) or (ii) below):

☐ (i) Lessor has provided the Lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents):

_____

☑ (ii) Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**LESSEE'S ACKNOWLEDGMENT: (INITIAL)**

(c) _____ Lessee has received copies of all information listed above.

(d) _____ Lessee has received the pamphlet "Protect Your Family from Lead in Your Home."

**AGENT'S ACKNOWLEDGMENT: (INITIAL)**

(e) _____ Agent has informed the Lessor of the Lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**CERTIFICATION OF ACCURACY:** *The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.*

X _Steven L. Stanley_    _4/12/9_    X _____    _____
LESSEE                         DATE              LESSEE                  DATE

X _____    _____    X _____    _____
LESSEE                  DATE              LESSEE                  DATE

X _____    _9/12/2017_    X _____
AGENT                    DATE                        LESSOR                  DATE

Form M027 OR-WA Copyright © 2014 Multifamily NW® NOT TO BE REPRODUCED WITHOUT WRITTEN PERMISSION - Revised 12/4/2014